USCA1 Opinion

 

 February 3, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1225 WATERVILLE INDUSTRIES, INC., Plaintiff, Appellee, v. FINANCE AUTHORITY OF MAINE, Defendant, Appellant. ____________________ No. 92-1338 WATERVILLE INDUSTRIES, INC., Plaintiff, Appellant, v. FINANCE AUTHORITY OF MAINE and FIRST HARTFORD CORPORATION, Defendants, Appellees. __________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. D. Brock Hornby, District Judge] ______________ ____________________ Before Breyer, Chief Judge, ___________ Bownes, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ Martha C. Gaythwaite with whom Harold J. Friedman, Friedman & ______________________ ___________________ __________ Babcock, Stephen A. Canders and Elizabeth Bordowitz were on brief for _______ __________________ ___________________ Finance Authority of Maine. Jotham D. Pierce, Jr. with whom Adam H. Steinman, Eileen J. ______________________ _________________ __________ Griffin, and Pierce, Atwood, Scribner, Allen, Smith & Lancaster were _______ ____________________________________________________ on brief for Waterville Industries, Inc. ____________________ February 3, 1993 ____________________ BOUDIN, Circuit Judge. Waterville Industries, Inc., ______________ brought suit against the Finance Authority of Maine ("FAME") seeking contribution to "response costs" assessed against Waterville Industries by the Environmental Protection Agency under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. 9601 et seq. __ ___ FAME, claiming the protection of statutory exceptions to CERCLA liability, appeals from the district court's decision that it is responsible for 60 percent of those costs. Waterville Industries cross-appeals from the district court's refusal to order FAME to contribute to its attorneys' fees. We conclude that FAME is exempt from contribution under CERCLA and therefore do not reach the cross-appeal relating to the amount of contribution. I. This action arises out of efforts to clean up two waste water lagoons located at a defunct textile mill in Waterville, Maine. Although the genesis of the mill is neither clear from the record nor critical to the case, it appears that the First Hartford Corporation developed the mill in the early 1970's with state assistance.1 In or ____________________ 1First Hartford's role was carried out by two related corporations, First Hartford Corporation and First Hartford Realty Corporation; the latter held the lease on the real property in question but subleased it to First Hartford Corporation. We refer throughout the opinion to the dual enterprise as "First Hartford." -3- -3- about 1972, First Hartford acquired the property, sold it to Waterville Textile Development Corporation -- a quasi-public corporation unconnected with the appellee in this case -- and then leased it back. Loans in connection with the project were made to First Hartford by Society for Savings, an out- of-state lender, and secured by mortgages on the property, which Society for Savings held. The loans were guaranteed by appellant FAME, an instrumentality of the state of Maine.2 In 1980, First Hartford defaulted on the loans. As a result, FAME pursuant to its guarantee made substantial payments to Society for Savings to cure the defaults, assumed First Hartford's future obligations to Society for Savings, and received from the latter an assignment of the mortgages. On the same day that it received the mortgages, March 14, 1980, FAME accepted a deed in lieu of foreclosure from Waterville Textile Development Corporation and became the holder of title to the property. On the same day, FAME leased the property back to First Hartford to allow First Hartford to continue to operate the mill. The new lease required First Hartford to make monthly payments directly to Society for Savings to cover obligations coming due on the original debt which FAME had assumed. The ____________________ 2In 1972, FAME's functions were carried out by the Maine Industrial Building Authority. That entity was later succeeded by the Maine Guarantee Authority which was in turn succeeded by FAME. In this opinion, we will for simplicity refer to the successive entities as "FAME." -4- -4- lease also required First Hartford to pay an additional $22,340 per month directly to FAME. During the period in which First Hartford operated the mill as a lessee of FAME, First Hartford released certain hazardous wastes into two lagoons associated with the mill. First Hartford continued to experience financial trouble after the March 14, 1980, transactions, and filed for Chapter 11 bankruptcy protection on February 20, 1981. First Hartford ceased operations at the mill on October 6, 1981. Apparently a dispute then occurred between First Hartford and FAME as to whether First Hartford had a continuing interest in the property. This dispute was resolved in a "settlement stipulation" approved by the bankruptcy court on July 29, 1982, which provided that "title to the Real Property is vested solely in [FAME]," but which gave First Hartford until October 15, 1982, to find a buyer for the property. First Hartford did not find a buyer by October 15, 1982, and on or about March 29, 1983, FAME contracted with an auctioneer to sell the property. An auction was held on August 19, 1983, and MKY Realty was the high bidder. On September 23, 1983, FAME and MKY Realty entered into a contract for the sale of the property, and on November 15, 1983, FAME conveyed the property to Gano Industries, the nominee of MKY Realty. Gano Industries later changed its name to Waterville Industries, the appellee in this case. -5- -5- II. In September 1988, the EPA filed an administrative complaint against Waterville Industries seeking penalties and response costs under CERCLA in connection with the clean-up of the lagoons. As the current owner of the property, Waterville Industries was liable for such costs under the statute. 42 U.S.C. 9607(a)(1). Waterville Industries entered into a consent agreement with EPA to clean up the property. It has now incurred substantial engineering costs in connection with the clean-up, and further expenses are expected. Waterville Industries then brought this action pursuant to CERCLA contending that FAME, as a former owner of the property, is liable for contribution. 42 U.S.C. 9613(f) (authorizing contribution action against "any other person who is liable or potentially liable" for clean-up costs). CERCLA holds several categories of persons liable for the clean-up of hazardous substances at a facility, including "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of[.]" 42 U.S.C. 9607(a)(2). Waterville Industries argues that FAME is liable for contribution because it "owned" the property between March 14, 1980, and October 6, 1981, during which time hazardous substances were released into the lagoons by First -6- -6- Hartford. The statute, however, contains exceptions to the definition of an "owner," one of which excludes from that status "a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility." 42 U.S.C. 9601(20)(A). FAME has contended throughout the litigation that it falls within this security interest exception from CERCLA liability. Waterville Industries' main response is that when FAME accepted a deed in lieu of foreclosure on March 14, 1980, it "became the owner in fee simple of the land, and the mortgages merged into the deed and disappeared." At that point, Waterville Industries argues, FAME no longer had a "security interest" to protect because it was the outright owner of the property, and therefore the secured creditor exception by its terms became inapplicable. The district court accepted this reasoning, holding: From March 14, 1980, to October 6, 1981 [the date First Hartford ceased operations,] [FAME] was an owner with a leasehold relationship to the operator and was during that time no longer protecting a security interest as it might have been had it been a mortgagee or as it might have done prior to its taking the March 14, 1980, deed. Our own analysis begins with the construction of CERCLA's security interest exception, plainly an issue of -7- -7- law.3 The purpose of the exception, apparent from its language and the statutory context, is to shield from liability those "owners" who are in essence lenders holding title to the property as security for the debt. Congress may have been concerned with maintaining sources of credit or may have thought that CERCLA's far-reaching liability should be limited to those owners who had the real equity interest in the property. In all events, legislative history and case law confirm that Congress had in mind not only the classic case of the bank mortgage but also equivalent devices serving the same function, such as lease financing arrangements.4 Our review of the record persuades us that what FAME received from Waterville Textile Development Corporation through the March 14, 1980, transactions was the nominal title typical of the lender in a lease financing transaction. Waterville Textile Development Corporation was a quasi-public development corporation used in connection with the 1972 loans in order to hold title to the property; it purchased ____________________ 3In this case, we have accepted the trial court's findings of fact, as supplemented by other facts drawn from the record. In re Crown Sportswear, Inc., 575 F.2d 991, 993 _____________________________ (1st Cir. 1978). 4See H.R. Rep. No. 172, pt. 1, 96th Cong., 1st Sess. 36 ___ (1979) (an "owner" does not include a person who "hold[s] title . . . in connection with a lease financing arrangement under the appropriate banking laws, rules or regulations"); In re Bergsoe Metal Corp., 910 F.2d 668 (9th Cir. 1991) ____________________________ (lease financing is a security interest under CERCLA). -8- -8- the property from First Hartford for $1 and then leased it back to First Hartford. That lease in turn gave First Hartford an option to buy the property for $1 at the end of the lease (or, based on formula payments, even before the lease expired if it chose). This is an ordinary lease financing arrangement, commonly called a sale and lease back. See, e.g., In re PCH Assocs., 949 F.2d 585, 599-600 (2d Cir. ___ ___ _________________ 1991). When FAME acquired title from Waterville Textile Development Corporation on March 14, 1980, it simultaneously re-leased the property to First Hartford, altering the payment terms as already described. But the new lease, which is part of the record, also provides that "[e]xcept as modified or referred to by the terms of this Agreement, in all other respects, the Underlying Leases and Sublease between [Waterville Textile] Development, [First Hartford] Realty and First Hartford shall remain in full force and effect." Thus, First Hartford's payment obligations were altered but its option to buy the property for $1 remained in force and the lease financing character of the transaction remained unchanged. The payments required under the new March 14, 1980, lease reinforce our conclusion. First Hartford was committed to continue payments to Society for Savings just as before and also to make monthly payments of just over $22,000 -9- -9- directly to FAME. Although Waterville Industries points to the latter payment as "profits" inconsistent with the supposed passive- lender role of FAME, the lease shows that the total payments were to be limited to $868,982. We think the fair inference from this limitation supports FAME's explanation that the payments to it were intended to repay FAME for its own payments to Society for Savings made under the guarantee in order to cure First Hartford's own default. There are yet other signs that FAME's interest was that of a security holder.5 We think that the able district judge may have been misled on the security interest issue by the failure of the parties to develop the precise rights of First Hartford under the March 14, 1980, lease, including (by incorporation of the original 1972 lease) the option to purchase for $1. Although the security interest exception was argued vigorously on both sides in this court, the facts as to the option are not mentioned in the briefs. If FAME had re- leased the property to Waterville Industries on March 14, 1980, without continuing the purchase option, our line of analysis would be different and FAME's current position could be weaker. ____________________ 5For example, First Hartford continued to be responsible for real estate taxes and the payment schedule provided that the monthly sums payable to FAME were to be applied first to "interest," which suggests repayment of a debt. -10- -10- Our view of the matter accords with that of the Ninth Circuit in In re Bergsoe Metal Corp., 910 F.2d 668 (9th Cir. ________________________ 1991). There the court upheld the exemption claim under the security interest exception of a titular owner who held title to property merely as security in a sale-and-lease-back transaction. While there are factual distinctions, the holding and thrust of the case supports FAME's exempt status in the year following March 14, 1980. We note also that EPA has recently adopted regulations declaring that the security interest exception applies to "title held pursuant to lease financing transactions." 40 C.F.R. 300.1100(b)(1). These regulations do not govern for they were not in effect at the time of the events in this case.6 Since our reading of the statute on this issue does not rest upon the regulations, we need not resolve arguments between the parties concerning the weight to be accorded to the EPA's views. The more difficult problem for FAME is its status under the exemption after October 6, 1981, when First Hartford _____ ceased operation. Thereafter--precisely when is less certain--First Hartford presumably lost its rights under the lease and, as sometimes happens to security holders, FAME's titular ownership became real and no longer merely a security ____________________ 6The regulations are currently under review in the D. C. Circuit in cases not yet briefed or argued. Michigan v. EPA, ________ ___ C.A. No. 92-1312 (Pet. filed July 28, 1992); Chemical Mfrs. ______________ Ass'n v. EPA, C.A. No. 92-1314 (Pet. filed July 28, 1992). _____ ___ -11- -11- interest. However, we think such a maturation of ownership does not divest the owner of protection under CERCLA's security interest exception so long as the owner proceeds within a reasonable time to divest itself of ownership. Why this is so, and how FAME then fares under this reading of the statute, are separate questions which we address in that order. Admittedly, CERCLA itself does not explicitly provide any period for divestiture after the collapse of a financing arrangement, but such a "safety zone" seems to us implicit in the statute. Were it otherwise, every sale and lease-back arrangement would subject the lender-lessor to the risk of sudden CERCLA liability whenever the lessee, by default or otherwise, lost its contractual rights to regain full ownership. So long as the lender-lessor makes a reasonably prompt effort to divest itself of its unwelcome ownership, we think continued coverage under the exception serves its basic policy: to protect bona fide lenders and to avoid imposing liability on "owners" who are not in fact seeking to profit from the investment opportunity normally presented by prolonged ownership. The sparse case law on this point is divided with two decisions supporting our approach and one opposed.7 ____________________ 7Supporting our view are United States v. Mirabile, 15 _____________ ________ Envtl. L. Rep. 20994, 20996 (E.D. Pa. 1985), and In re T.P. __________ Long Chem., Inc., 45 Bankr. 278, 288-89 (Bankr. N.D. Ohio ________________ -12- -12- EPA has followed the same path in its new regulations. It provides a safe harbor of 12 months within which the security interest holder may take title and offer the property for sale, noting that one who delays longer "may still be able to show that it has acted consistently with the exemption . . . ." 57 Fed. Reg. 18,344, 18,364 (Apr. 29, 1992). Again, we have reached our own conclusion independently of the regulations, which technically do not apply to pre-adoption events. Certainly EPA's choice of 12 months for its safe harbor cannot govern this case, for such bright-line rules make sense only when known to affected parties in advance. Instead, we think the question is whether, under all the circumstances, FAME acted reasonably promptly to divest itself of ownership once the lease arrangement ended. The earliest time that one would expect a security holder to start to divest itself of unwelcome ownership would ordinarily be when the security holder obtained full title free of serious encumbrances. So long as First Hartford held a lease with an option to buy for $1, FAME was still only a ____________________ 1985). At odds with our approach is Guidice v. BFG _______ ___ Electroplating & Mfg. Co., 732 F. Supp. 556 (W.D. Pa. 1989), _________________________ unless a voluntary purchase at a mortgage foreclosure sale is distinguished from the automatic termination of a lease. Finally, United States v. Maryland Bank & Trust Co., 632 F. _____________ ________________________ Supp. 573 (D. Md. 1986), relied upon by Waterville, does not reach our issue, the foreclosing mortgagee in that case having failed promptly to resell the property after foreclosure. -13- -13- security holder protected by the exception. First Hartford filed for Chapter 11 reorganization on February 20, 1981, and ceased operation of the mill on October 6, 1981. FAME then filed an application in the bankruptcy proceeding seeking an order declaring it the owner of the property and directing First Hartford to surrender possession; First Hartford opposed the application. Not until July 15, 1982, did First Hartford and FAME enter into a stipulation that "affirmed that title to the real property was vested solely in [FAME's predecessor] and terminated the rights of First Hartford and First Hartford Realty in the various leases."8 Even then First Hartford was given until October 15, 1982, to seek a buyer for the property. Thus, it was only after October 15, 1982, that FAME was finally in a position to give an unclouded and unencumbered title to a purchaser. Within six months of that date, FAME had contracted (in late March 1983) with an auctioneer to sell the property. After an auction, FAME agreed (in September 1983) to sell the property to MKY Realty, the successful auction bidder, and it conveyed title not long afterwards (in November 1983). Based on this sequence of ____________________ 8The stipulation provided that "First Hartford and Realty waive any and all rights or claims to be declared the legal or equitable owner of the real property." First Hartford was also granted a right to the proceeds of any sale so far as they exceeded a specified sum, apparently computed to approximate FAME's own past and pending debts on the guarantees. -14- -14- events, we think it is apparent that FAME made diligent efforts to dispose of the property in a timely fashion: until October 1981, FAME had only a security interest; a quarrel over First Hartford's interest delayed matters until October 1982; and within six months thereafter, FAME had placed the property on the market leading to its sale within the year. III. In conclusion, we are satisfied based on the record that FAME is fully protected by the security interest exception. Waterville Industries complains bitterly in its brief that FAME sold it the property through MKY Realty without making full disclosure of the hazardous wastes or of notices of violation sent to FAME, and there is separate litigation between the parties on this subject. But the right of contribution under CERCLA is a statutory one that here turns solely on FAME's status as an "owner," a status defeated by the security interest exception. Waterville Industries' other claims against FAME, whatever their nature or merits, are a matter for another forum. Having resolved the case based on the security interest exception, we do not reach FAME's separate claim that it is also protected by the provision exempting a state unit that acquires ownership "involuntarily . . . by virtue of its function as sovereign." 42 U.S.C. 9601(20)(D). This exemption, which the district court rejected on the ground -15- -15- that the acquisition was voluntary, presents difficult problems of interpretation that we need not address. Similarly, our reversal of the award of contribution makes it unnecessary to consider the cross-appeal of Waterville Industries seeking attorneys' fees as part of that contribution. Reversed. ________ -16- -16-