**UNITED STATES of America; United States Department of Transportation; United States Coast Guard Curtis Bay, Plaintiffs,**

v.

**Wilbur McLAMB; Barbara McLamb; Investors Management Corporation, Defendants–Appellants.**

**Otto SKIPPER; Jimmy F. Cain; Peggy Cain; Hubert J. Anderson; Ada Anderson, Defendants,**

v.

**WACHOVIA BANK AND TRUST COMPANY, N.A., Third Party Defendant–Appellee.**

No. 93–1184.

United States Court of Appeals, Fourth Circuit.

Argued July 14, 1993.

Decided Sept. 17, 1993.

Amended by Order filed Oct. 18, 1993.

Auley McRae Crouch, III, Carr, Swails, Huffine & Crouch, Wilmington, NC, argued (Camilla M. Herlevich, on the brief), for defendants-appellants.

Stephen Roland Berlin, Petree Stockton, Winston–Salem, NC, argued (J. Robert Elster, J. Stephen Shi, Petree Stockton, on the brief), for third party defendant-appellee.

Before PHILLIPS and MURNAGHAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

## OPINION

MURNAGHAN, Circuit Judge:

In 1989, the United States filed a civil action pursuant to Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, to recover costs incurred for actions taken in response to the release of hazardous substances on several acres of land known as "Potter's Pits." Potter's Pits is located in Sandy Creek Acres, North Carolina. Named as defendants in the action were former landowners: Wilbur McLamb and Barbara McLamb, Jimmy F. Cain and Peggy Cain, Hubert J. Anderson and Ada Anderson, Investors Management Corporation ("IMC"), and Otto Skipper.

In August 1990, the appellants—the McLambs and IMC—joined several of their co-defendants in filing a third-party complaint against appellee Wachovia Bank & Trust Co., N.A. ("Wachovia").[1] The complaint alleged fraud, negligent misrepresentation, breach of implied warranty, and contribution claims under CERCLA and North Carolina law.

Wachovia, in 1979, had taken a security interest in 217 acres of land, which included the Potter's Pits area, as collateral for a loan it had made to Otto Skipper. After Skipper defaulted in 1980, Wachovia purchased the land as the sole bidder at a foreclosure sale. Several months later Wachovia sold the land to the Cains and McLambs for residential development. Contamination at the Potter's Pits area was thereafter discovered, and the clean-up and inevitable suits for cost recovery followed.

The district court granted summary judgment in favor of Wachovia on the appellants' CERCLA claim on the grounds that the bank was exempt from liability pursuant to the security interest exemption found in 42 U.S.C. § 9601(20)(A) and 40 C.F.R. § 300.-1100(d) (1992).[2]

The appellants now appeal the grant of summary judgment in favor of Wachovia. They maintain that Wachovia is liable for contribution under CERCLA because it became an outright "owner" of the contaminated site when it purchased the property at the foreclosure sale. Therefore, the argument continues, the bank does not qualify under the statutory exemption as a secured holder who had "indicia of ownership primarily to protect [its] security interest." They further contend that Wachovia should not fall within the security interest exemption because it did not act in a commercially reasonable manner after it took title to the property.

## I.

The security interest in approximately 217 acres of land as collateral for a loan Wachovia made to Otto Skipper came into being in 1979. The 217 acres securing Wachovia's loan was generally undeveloped, rural land. During the 1970s, Skipper allegedly disposed of various hazardous waste materials at the undeveloped Potter's Pits site. In August 1976, the United States Coast Guard re-

---

1. The Cains and the Andersons have since settled with the government. The government also has obtained an entry of default against Otto Skipper. The McLambs and IMC thus remain the only parties still seeking contribution from Wachovia.

2. The McLambs and IMC conceded during the proceedings below that their state law claims for fraud, negligent misrepresentation, and contribution were barred by the applicable statute of limitations. The district court also granted Wachovia's motion to dismiss the breach of implied warranty claim.

sponded to complaints of an oil spill at Potter's Pits, and a clean-up operation commenced. Any sludge remaining in the area following the clean-up allegedly was mixed with sand and buried.

Skipper defaulted on his loan in February 1980, and Wachovia exercised its rights as beneficiary under a deed of trust and foreclosed on the property. As was standard practice at the time, Wachovia referred the foreclosure to outside legal counsel. The counsel and the local court clerk handled the foreclosure process, and the sale was conducted according to state law. Wachovia, however, was the only bidder at the sale. As a result, it purchased the property and took title to the 217 acres on March 25, 1980. It did so, Wachovia has contended, solely to protect its security interest.

Several days later, Wachovia signed a standard listing contract with local realtors to sell the entire property. No attempt was made by Wachovia following the foreclosure and the listing to develop or manage the 217 acres. Shortly after the placing of the property on the market, Jimmy Cain emerged as a potential purchaser. Both Cain and appellant McLamb visited the property, and on October 8, 1980, the men purchased the 217 acres.[3] There was no discussion at the time of the sale of any prior oil spills at the Potter's Pits area. The district court concluded that the there was no indication that Wachovia had knowledge of the old oil spill prior to taking a security interest. It further found that the record reflected that Wachovia learned of the previous oil spill at Potter's Pits after the foreclosure but prior to selling the property. The district court made no findings in its opinion as to the appellants' knowledge of the past oil spill or as to whether the spill and subsequent clean-up were easily discoverable through reasonable investigations into the property.

Cain and McLamb began developing the 217 acres into a residential subdivision called Sandy Creek Acres.[4] Lots were sold. Earl Gurkin and his wife purchased Lot 85 in July 1982, and Lot 86 in early 1983. In July 1983, however, Wilbur McLamb received a letter from the Brunswick County Health Department indicating that Lots 85 and 86 were located near or on the site where the contamination had occurred in 1976. The letter also explained that the hazardous waste had not been entirely cleaned up. The Environmental Protection Agency ("EPA") began investigating the Gurkin's property in late 1983, and, shortly thereafter, it conducted a removal action at the site.

II.

We review the grant of summary judgment *de novo*. Left only with their CERCLA claim against Wachovia, the appellants seek contribution from the bank pursuant to CERCLA's contribution provision, 42 U.S.C. § 9613(f)(1). Section 9613(f)(1) authorizes a contribution action against "any other person who is liable or potentially liable" for clean-up costs under CERCLA.[5] Section 9607(a) of CERCLA provides four categories of persons liable for costs associated with the release or threatened release of hazardous substances. The list includes "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). The appellants contend that, in accordance with § 9607(a)(2), Wachovia is liable for contribution because it "owned" the property at the time hazardous substances were released in the Potter's Pits area.

CERCLA, however, also excludes from the definition of an "owner or operator," any "person, who, without participating in the

3. Wachovia states that other individuals also showed an interest in buying the property but were unable to consummate a purchase. Apparently, the Cains and the McLambs were the first prospective buyers able to consummate a deal.

4. During the development, the Andersons acquired the Cains' undivided half interest in the property. The McLambs and Andersons then transferred their interests to the newly formed company and party to the instant appeal, IMC.

5. Section 9613(f)(1) states in pertinent part:

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under 9606 of this title or under section 9607(a) of this title.

management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility." 42 U.S.C. § 9601(20)(A). Wachovia has maintained that it falls within the security interest or "safe harbor" exemption of § 9601(20)(A). In essence, Wachovia's contention is that it acted at the time in accordance with routine and acceptable lending practices. Because of the default on the loan, it foreclosed on the property and then took title as the sole bidder merely to protect its security interest.

The appellants primarily respond that Wachovia cannot rely on the security interest exemption because, as a result of the foreclosure sale, the bank "owned" the property for at least several months. When it exercised its rights under the deed of trust, the bank, it is argued, lost its status as one who holds "indicia of ownership primarily to protect its security interest." Hence, the appellants contend, the exemption by its terms is inapplicable. The appellants urge that in keeping with the remedial goals of CERCLA, the exemption should be read narrowly, and they cite in support of their position *United States v. Maryland Bank & Trust Co.*, 632 F.Supp. 573 (D.Md.1986), and *Guidice v. BFG Electroplating & Mfg. Co.*, 732 F.Supp. 556 (W.D.Pa.1989).

▮ We decline to adopt the analysis offered by the appellants and instead agree with the district court that, under the circumstances of the instant case, Wachovia was exempt from liability pursuant to § 9601(20)(A).[6] Nothing in the plain language requires, contrary to the appellants' suggestion, that the exemption be read to apply solely to the classic mortgagor/mortgagee arrangement in "title" theory states. *Cf. Waterville Indus., Inc. v. Finance Auth.*, 984 F.2d 549, 552 (1st Cir.1993) ("The purpose of the exception, apparent from its lan-

guage and the statutory context, is to shield from liability those 'owners' who are in essence lenders holding title to the property as security for the debt."). We find helpful the analysis in *In re Bergsoe Metal Corp.*, 910 F.2d 668 (9th Cir.1990). Although not confronted with the situation in which a secured creditor took legal title through foreclosure, the *Bergsoe* court noted that there was "no question" that, in one sense, the local port authority from whom contribution was sought "owned" the contaminated property as a result of the parties' complex financial arrangements. The court, however, emphasized that because "the Port holds paper title to the [facility] does not, alone, make it an owner of the facility for the purposes of CERCLA; *under the security interest exception the court must determine why the Port holds such indicia of ownership.*" *Id.* at 671 (emphasis added). The security interest exemption was found to apply because the local port authority had accepted the warranty deeds essentially as security in a sale-and-lease-back arrangement. *Id.*

In the instant case, due to the lack of other potential buyers at the foreclosure sale, Wachovia purchased the property, in the language of the statute, "primarily to protect its security interest" after Skipper's default. The record reveals no investment or profit motive for acquiring the property. Wachovia did not, for example, engage in a bidding war at the foreclosure sale. Further, Wachovia almost immediately placed the property on the market, took no steps to use or manage the land during its ownership, and ultimately sold the property to the first able buyer. Such steps support its claim that it held title primarily, indeed exclusively, to protect its security interest.

6. We also note that the district court in *Maryland Trust,* a case cited by the appellants, was not confronted with the same circumstances that we address in the instant case. In *Maryland Trust* the court concluded that the security interest exemption "does not apply to former mortgagees currently holding title after purchasing the property at a foreclosure sale, *at least when, as here, the former mortgagee has held title for nearly four years, and a full year before the EPA clean-up.*" *Maryland Trust,* 632 F.Supp. at 579 (emphasis

added). In addition, the district court in *Maryland Trust* explicitly stated that "[b]ecause [the former mortgagee] has held the property for such an extended period of time, this Court need not consider the issue of whether a secured party which purchased the property at a foreclosure sale and then promptly resold it would be precluded from asserting" the exemption. *Id.* at 579 n. 5. By contrast, Wachovia promptly resold, following the foreclosure, the 217 acres.

Similarly, in *Waterville Industries, Inc. v. Finance Authority*, 984 F.2d 549 (1st Cir. 1993), the First Circuit examined the actions of a lender/lessor, the Finance Authority of Maine, after it acquired "real" title to contaminated property in a sale-and-lease-back arrangement. The Finance Authority's titular ownership became real when the lessee ceased operations and lost its rights under the lease. The court went on to find that once the Finance Authority acquired real title, it made diligent efforts to dispose of the property as quickly as possible. The Finance Authority therefore demonstrated its lack of a profit motive and preserved its right to invoke § 9601(20)(A):

> [W]e think such a maturation of ownership does not divest the owner of protection under CERCLA's security interest exception.... So long as the lender-lessor makes a reasonably prompt effort to divest itself of its unwelcome ownership, we think continued coverage under the exception serves its basic policy: to protect bona fide lenders and to avoid imposing liability on "owners" who are not in fact seeking to profit from the investment opportunity normally presented by prolonged ownership.

*Id.* at 553.

We apply that analysis to the instant case and likewise are satisfied that Wachovia took prompt actions to resell the property. Accordingly, we conclude that because Wachovia took title at the foreclosure sale solely to protect its security interest and then acted reasonably promptly to divest itself of ownership, it met § 9601(20)(A)'s requirement of holding "indicia of ownership primarily to protect its security interest." [7]

Wachovia also has fulfilled the second requirement to § 9601(20)(A): no participation in the management of the property. Nothing in the record reflects that Wachovia participated in the management of the site, and the district court specifically found that "Wachovia did not attempt to develop or manage the property but continued to hold it solely to protect its security interest." Therefore, Wachovia has successfully passed both hurdles of § 9601(20)(A), and summary judgment was properly granted.

Wachovia, in addition to relying on the language of the statute and case law interpreting § 9601(20)(A), offers as further support of its position the EPA's final rule on lender liability under CERCLA. *See* 40 C.F.R. § 300.1100 (1992). The rule attempts to clarify and to define the "range of permissible actions that may be undertaken by a holder without exceeding the bounds of the ... security interest exemption." Final Rule on Lender Liability Under CERCLA, 57 Fed.Reg. 18,344, 18,346 (Apr. 29, 1992) (EPA's preamble to the final rule). It elaborates, for example, upon the meaning of "indicia of ownership" and includes within its illustrations legal title acquired pursuant to foreclosure. *See* 40 C.F.R. § 300.1100(a). On the facts of the instant case, it appears at least initially that the EPA rule would lead to the same conclusion as the one we have reached under the statute.

The parties dispute, however, whether the April 29, 1992, regulation applies retroactively to events occurring before that date. We need not address the applicability of the rule.[8] Our reading of the statute persuades us that Wachovia falls within the security interest exemption, and we therefore reach our conclusion independently of the regulation.

■ Finally, the appellants also attempt to avoid the application of § 9601(20)(A) by asserting that Wachovia did not act in a "commercially reasonable manner" when it failed to inform Cain and McLamb of the 1976 oil spill and clean up operation before selling the property. The district court rejected the argument primarily on the grounds that a requirement of "commercial reasonableness" would "effectively emasculate the protection afforded by the statute."

---

7. Also providing support for our position are *United States v. Mirabile*, 15 Envtl.L.Rep. 20,992, 20,994, 1985 WL 97 (E.D.Pa.1985) and *In re T.P. Long Chemical, Inc.*, 45 B.R. 278, 288–89 (Bankr.N.D.Ohio 1985).

8. We note that the EPA's regulation is currently being challenged in the D.C. Circuit. *Michigan v. EPA*, No. 92–1312 (D.C.1992); *Chemical Mfrs. Ass'n v. EPA*, No. 92–1314 (D.C.Cir.1992).

The statute clearly contains no language requiring commercially reasonable behavior. The two requirements set forth on the face of § 9601(20)(A) are that the lender cannot participate in the management of the facility and that it must hold indicia of ownership primarily to protect its security interest. It seems that the appellants have attempted to salvage—and understandably so—their time-barred state law claims for fraud and negligent misrepresentation by imposing an additional hurdle of commercial reasonableness. We note that the First Circuit in *Waterville* also rejected a similar argument made by the party seeking contribution:

> Waterville Industries complains bitterly in its brief that [the Finance Authority] sold it the property through MKY Realty without making full disclosure of the hazardous wastes or of notices of violations sent to [the Finance Authority], and there is separate litigation between the parties on this subject. But the *right of contribution under CERCLA is a statutory one that here turns solely on [the Finance Authority's] status as an "owner," a status defeated by the security interest exception. Waterville Industries' other claims against [the Finance Authority], whatever their nature or merits, are a matter for another forum.*

*Waterville*, 984 F.2d at 554 (emphasis added).

We similarly conclude that commercial reasonableness is not, under CERCLA, a requirement before § 9601(20)(A) becomes applicable.

Accordingly, the judgment is

AFFIRMED.