**ELF ATOCHEM NORTH AMERICA**

v.

**UNITED STATES of America and Witco Corporation.**

**UNITED STATES of America**

v.

**WITCO CORPORATION**

v.

**ELF ATOCHEM NORTH AMERICA.**

Civ. A. Nos. 92–7458, 94–0662.

United States District Court, E.D. Pennsylvania.

Feb. 12, 1996.

William J. Kennedy, Frederick G. Herold, Eli R. Brill, Dechert, Price & Rhoads, Philadelphia, PA, for Elf Atochem North America, Inc.

Brud Rossmann, U.S. Department of Justice, Environmental and Natural Resources Division, Jonathan A. Marks, U.S. Department of Justice, Environmental Enforcement Section, Washington, DC, for United States.

Michael R. Lazerwitz, Charles F. Lettow, Christopher G. Smith, Cleary, Gottlieb, Steen

& Hamilton, Washington, DC, for Witco Corporation.

## MEMORANDUM

JOYNER, District Judge.

Today we resolve cross-motions for summary judgment asking whether the United States is liable as an Owner, Operator and/or Arranger under section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601–75 (1995) (CERCLA).

The claims against the United States are based on manufacturing activities that took place during World War Two at a location now known as the Myers Property. In 1941, Elko Chemical Works, Inc. obtained a one-year government contract to manufacture arsenic trichloride for the government. Arsenic trichloride is a component of the poison gas Lewisite, which was in high demand at the time. That demand was quickly satisfied, however, and the United States terminated Elko's arsenic contract in 1942. In 1944, Elko obtained a contract to manufacture DDT for the United States and soon after, sold its facilities at the Myers Property to PennSalt Manufacturing Company, which assumed the DDT contract and continued to produce DDT at the Myers Property. PennSalt is the predecessor in interest to Elf Atochem North America, a Plaintiff and Third–Party Defendant in these consolidated actions.

Today, the land and ground water on and around the Myers Property are contaminated with many hazardous substances, including arsenic as well as chlorobenzene and benzene, which are used in the manufacture of DDT. In 1983, the Environmental Protection Agency placed the Myers Property on CERCLA's National Priorities List. In 1992, Elf and the EPA entered into a consent decree that requires Elf to remediate the Myers Property, but allows it to seek contribution from other sources. Elf seeks contribution from Witco Corporation, a subsequent owner of the Myers Property, and from the United States for its actions during World War Two. These consolidated actions have resulted. The particular facts relevant to these motions will be discussed as needed in the body of the analysis.

## SUMMARY JUDGMENT STANDARD

In considering a motion for summary judgment, a court must consider whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

All of the facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in favor of the non-moving party. *Id.* at 256, 106 S.Ct. at 2514. Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must establish the existence of each element of its case. *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)).

## I. DISCUSSION

Witco moves for a summary judgment that the United States is liable as an Owner and Arranger under § 107(a). The United States cross-moves for a summary judgment that it is not liable as either an Owner, Arranger or Operator. Elf maintains that this Court need not decide either motion because the United States has already been found liable as an Owner of DDT facilities. Under CERCLA, once a party is liable in any respect, joint and several liability attaches. Despite this, we will consider the United States's potential additional liability and thereby clarify this complicated action's issues for trial.

The tests for Owner, Arranger and Operator liability are each different, but certain critical elements are common to all three.

These are (1) whether one owns facilities and (2) whether one manages or controls the operations. We will look at these two common issues first and then apply them to each liability category in turn.

### A. Ownership of the Arsenic Chlorinators

■ Witco asserts that the United States owned certain chlorinators used to manufacture arsenic trichloride. This ownership is based on the United States's alleged financing of Elko's acquisition of the chlorinators, probably through a system of advance payments. Lee Kolker 1993 Dep. at pp. 44–45; Witco Mot.Ex. 7. Under the law and regulations of the time, title to things financed by the United States immediately vested in the United States upon its making of advance payments.[1] 10 C.F.R. § 81.10(f)(2)(ii) (1938 & Supp.1940).

The United States agrees that the evidence suggests that it financed some of Elko's equipment, but maintains that no evidence directly ties it to the chlorinators. In fact, it proffers evidence that when Elko bid on the arsenic trichloride contract, it already owned the chlorinators, and therefor, their purchase could not have been financed by the United States. *See* U.S. Response at Ex. C.

Witco has not met its burden of showing no genuine issue of fact as to United States ownership of the arsenic trichloride chlorinators. For this reason, and as discussed more fully below, any aspect of these motions that depends on a finding of ownership of this equipment must be denied.

### B. Control of the Chemical Production

■ The second major issue is the level of management and/or control the United States had at the Myers Property. Witco contends that the United States was intimately involved with its operations, in part through the United States's unprecedented control over the American economy and private businesses during World War Two. With respect to the Myers Property, Witco and Elf point to evidence they assert shows extensive involvement, ranging from inspection powers to housing an Army Second Lieutenant at the Myers Property for security purposes. The United States also made recommendations for draft deferments for Elko employees, established strict guidelines for the exact product it required and gave Elko advice on safety in handling the finished products. An allegedly telling example of control was when the Army officer discovered that an Elko employee was of German descent and was sending money to Germany. After this discovery, the Government allegedly ordered Elko to fire this employee.

In response, the United States maintains that much of the above evidence does not show control so much as simple regulation. In *FMC Corp. v. United States*, 29 F.3d 833 (3d Cir.1994), the Third Circuit held that regulatory powers did not constitute actual control. In addition, in *United States v. Vertac Chem. Corp.*, 46 F.3d 803, 811 (8th Cir.1995), *cert. denied*, —— U.S. ——, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995), the Court ruled that allocation of raw materials did not constitute possession or ownership. Further, that any Government control over price, quality and quantity of production was simply a requirement of the contracts between it, Elko and PennSalt. The Government asserts its right to enter into contracts with specifications, delivery dates and the like, without being converted into a controller of the manufacture of the product.

---

**1.** At that time, the United States was prohibited from advancing money to private businesses. *Marine Midland Bank v. United States*, 687 F.2d 395, 400, 231 Ct.Cl. 496 (1982) (discussing Pub.L. No. 17–9, 3 Stat. 723 (1823)), *cert. denied*, 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983). To get around this limitation, the government used title-vesting clauses on the theory that if it gained title in return for a partial payment, no advance of public funds was made.

In the modern era, some courts such as *Marine Midland* have determined that this old thinking should be abandoned and that the vesting clauses do not actually vest ownership in the government. *Id.* 687 F.2d at 403; *cf. In re American Pouch Foods, Inc.*, 769 F.2d 1190, 1196 (7th Cir.1985) (rejecting *Marine Midland*), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1459, 89 L.Ed.2d 716 (1986). Even if we were to adopt *Marine Midland*, it would not affect today's analysis, because in the 1940s, the time when this action's events occurred, the law was well settled that vesting clauses were strictly construed. *American Pouch*, 769 F.2d at 1196.

Courts that find management or control have done so in situations where there is day to day management of the facility or actual control. *FMC*, 29 F.3d at 843; *United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1558 (11th Cir.1990), *cert. denied*, 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991). In contrast, when there is only financial advice or actions that are common in a traditional lender-borrower relation, sufficient management is not found. *United States v. McLamb*, 5 F.3d 69, 72 (4th Cir.1993); *Waterville Indus. v. Finance Auth.*, 984 F.2d 549 (1st Cir.1993); *In re Bergsoe Metal Corp.*, 910 F.2d 668, 672 (9th Cir.1990); *Maxus Energy Corp. v. United States*, 898 F.Supp. 399 (N.D.Tex.1995); *Rospatch Jessco Corp. v. Chrysler Corp.* No. 93–47 (W.D.Mich. Aug. 9, 1995); *Z & Z Leasing, Inc. v. Graying Reel, Inc.*, 873 F.Supp. 51, 55 (W.D.Mich.1995); *Guidice v. BFG Electroplating & Mfg. Co.*, 732 F.Supp. 556, 562 (W.D.Pa.1989).

We find that there is a genuine issue of fact whether the United States managed or controlled the Myers Property operations. The test for control uses a totality of the circumstances standard, which is unusual to resolve on summary judgment. This is especially so here, where several of the factors such as the number and nature of on-site inspections and visits are disputed. Accordingly, we will deny summary judgment on any issue for which control or management is an element.

## II. OWNER LIABILITY

As resolved above, there is a material issue of fact as to whether the United States owned the arsenic chlorinators, which precludes summary judgment on liability due to ownership of that equipment. It also precludes the secured creditor exemption the United States proffers as an affirmative defense because this exemption looks to both ownership and management issues in its analysis. 42 U.S.C. § 9601(20)(A); *United States v. Fleet Factors Corp.*, 901 F.2d 1550,

1555–56 (11th Cir.1990), *cert. denied*, 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991); *Kemp Indus. v. Safety Light Corp.*, 857 F.Supp. 373, 384 (D.N.J.1994).

■ The Government raises a second defense to ownership liability, namely that even assuming it owned the chlorinators, there was no release of hazardous wastes at that equipment, and therefore, no CERCLA liability.[2] It contends that the chlorinators were the first stage in the arsenic trichloride manufacturing process and that all the contents from the chlorinators were shunted to Elko-owned equipment for further purification, and therefore, any disposal was "at" an Elko-owned machine, not a United States-owned machine. Further, the United States argues that the sulfuric acid[3] that was used to "wash" the arsenic trichloride, and which would contain trace amounts of arsenic trichloride, was drained out of the chlorinators and disposed of into 55–gallon drums and either sold or given away to outside contractors. This allegedly indicates that all the acid was accounted for and therefore, was not released into the environment. Even if Elko employees did dispose of the sulfuric acid on-site, the United States contends that there is no showing that this was a disposal at its equipment, rather than at the Elf-owned equipment that transported the acid to the disposal site.

We find that there is insufficient evidence to prove this type of release of hazardous wastes. If usable product was shunted to other machines, then there is no release. If waste sulfuric acid was disposed of from the chlorinators, this could be a release except for the lack of evidence showing such release. The only real evidence demonstrates that the sulfuric acid was reclaimed in 55–gallon drums and sold or given away. Because of this we cannot grant summary judgment that releases of sulfuric acid entered the environment at the chlorinators.

■ Witco and Elf point to a second alleged release. The arsenic trichloride was

---

**2.** See this Court's previous ruling in *Elf Atochem North America, Inc. v. United States*, 868 F.Supp. 707, 710–12 (E.D.Pa.1994), for a review of "disposal" and "release" law.

**3.** There is some discussion of hydrochloric acid also being produced and disposed of, but there is not enough detail to allow a judicial discussion of it.

made by emptying 50–pound bags of arsenic trioxide into the chlorinators, where it would be mixed with hydrogen chloride gas. The arsenic trioxide took the form of a powder similar to granulated sugar and was delivered in four-ply paper bags. These bags were slit open by Elko employees and their contents poured into the chlorinators. It is apparently uncontested that during this process, a quantity of dust would settle on the building's floor and occupants.

Elf and Witco maintain that this is a release at the chlorinators. In contrast, the United States contends that if arsenic trioxide dust escaped from the bags and settled on the floor and then blew outside the building, this is in fact, a disposal at and release from Elko's floor, not the chlorinators.

We disagree. Common sense tells us that when one pours a substance into a container and some escapes as dust, that it is released at the container, not at the floor on which it lands. In addition, the United States's own expert testified that part of the escaping dust was caused by the powder displacing the air in the chlorinators. To do that, at least some powder must have entered the chlorinators before it was then blown out. For this reason, we find a discharge of arsenic trioxide at the allegedly United States-owned equipment. The arsenic trioxide was waste because it was abandoned. *Elf,* 868 F.Supp. at 710; *Reading Co. v. City of Philadelphia,* 823 F.Supp. 1218, 1236–37 (E.D.Pa.1993). And, it was released into the environment. *Elf,* 868 F.Supp. at 710–11 (citing cases). For this reason, we find a release of a hazardous substance at the chlorinators.

■ There is a dispute as to whether there was a release from the Government-owned tank cars. Witco and Elf suggest that there was because arsenic is found in that area. The United States argues that there is no evidence that arsenic was released from the tank cars. This is a question of fact and summary judgment cannot be granted here.

### III. ARRANGER LIABILITY

Witco and the United States cross-move on the issue whether the United States arranged for the disposal of hazardous substances under § 107(a)(3) of CERCLA. Witco premises the United States's Arranger liability on the test provided in *United States v. Aceto Agricultural Chems. Corp.,* 872 F.2d 1373 (8th Cir.1989). In that case, the Eighth Circuit held that a party is an Arranger if it (1) has authority to control the disposal of hazardous waste, even if it does not own or possess the waste, or if it (2) supplies raw materials to the disposer with the knowledge that hazardous waste will result and will need to be disposed of. *Id.* at 1382.

■ Witco contends that the United States had both the authority to control Elko's waste disposal and that it supplied Elko with the raw materials for both arsenic and DDT. Above, we resolved that there were material issues of fact as to the United States's authority to control Elko's process or the work in process itself. This issue of fact precludes summary judgment on the first prong of the *Aceto* test. Also above, however, we found that mere allocation of raw materials was not equivalent to supplying raw materials. For this reason, summary judgment can be granted on the second *Aceto* prong, in the United States's favor. *Vertac Chem. Corp.,* 46 F.3d at 811.

### IV. OPERATOR LIABILITY

■ A party can be liable as an Operator under CERCLA if it has "substantial control" over operations, such as day to day management or actual high-level control over management and decision making. *FMC Corp.,* 29 F.3d at 843; *Lansford–Coaldale Joint Water Auth. v. Tonolli Corp.,* 4 F.3d 1209 (3d Cir.1991). Whatever the level of control, it must be pervasive. *Id.* at 1222.

Above, we found that there were genuine issues of material fact as to whether the United States had control over the chemical production. For this reason, we cannot grant summary judgment on Owner liability.

An appropriate Order follows.

### ORDER

AND NOW, this 12th day of February, 1996, upon consideration of the Motion for Partial Summary Judgment of the United States Against Plaintiff Elf Atochem and De-

fendant Witco Respecting Their Claims Seeking to Hold the United States Liable as a CERCLA Operator and Arranger (doc. no. 148) and upon consideration of the Motion by Witco Corporation for a Summary Judgment that the United States is Liable as an "Owner" of Arsenic Trichloride Facilities and as an "Arranger" for Disposal of Wastes from Arsenic Trichloride and DDT Operations (doc. no. 170) and responses thereto, the Motions are hereby DENIED as discussed in the attached Memorandum.