[No. 40854-2-I. Division One. February 1, 1999.]

HARBOR STEPS LIMITED PARTNERSHIP, ET AL., *Appellants*, v. SEATTLE TECHNICAL FINISHING, INC., *Defendant*, BURLINGTON NORTHERN, INC., *Respondent*.

---

[14] 83 Wn. App. 750, 923 P.2d 721 (1996), *aff'd on other grounds*, 134 Wn.2d 176, 949 P.2d 358 (1998).

*Joseph E. Shickich, Jr.*, of *Graham & James, L.L.P./ Riddell Williams, P.S.*, for appellants.

*Bart J. Freedman* and *Cheri Y. Cornell* of *Preston Gates & Ellis*, for respondent.

BAKER, J. — Harbor Steps Limited Partnership and HSA, Inc. (Harbor) appeals the summary judgment dismissal of its claim for cleanup expenses related to a real property tract under Washington's Model Toxics Control Act (MTCA). The predecessor in interest of Burlington Northern, Inc. (Burlington) sold the property by real estate contract in 1910, shortly before the contamination occurred. Burlington contends that summary judgment was proper under the MTCA secured creditor exceptions to liability because it held only a security interest in the property during the time that it was contaminated. Burlington also contends that the 1995 amendments to the MTCA secured creditor exceptions were retroactive and that summary judgment is even more justified under the amended statute. We hold that the 1995 amendments to the MTCA secured creditor exceptions are retroactive. We also hold that Burlington's motion for summary judgment was properly granted irrespective of the 1995 amendments.

I

In 1910 Northern Pacific Railway, Burlington Northern's predecessor, entered into a 20-year real estate contract with C.L. Hibbard for the sale of a parcel of real property near the Seattle waterfront. Hibbard had the option to pay off the contract's balance at any time and receive title to the property.

The contract obligated Hibbard to "commence construc-

tion before July 15, 1910, of a substantial brick or concrete building at least three (3) stories in height, to cover all of the land herein agreed to be sold, and to complete the same within one (1) year from the date of this agreement." In the event of default, Northern Pacific had the right to demand full payment of the contract's balance and, if such was not paid, to keep all payments made and any buildings or improvements upon the property. An addendum to the contract obligated Hibbard to use Northern Pacific for at least 80 percent of the rail freight, if any, to and from the property during the term of the contract, provided that Northern Pacific offered "rates and conditions [which] are equal to [those] . . . existing on competitive railways."

Hibbard constructed the building as required, but first filled the site with lead contaminated dirt. Hibbard complied with all of his other obligations to Northern Pacific as well, and took title to the property after making his final payment in 1930.

Harbor later acquired the property. During excavation for a development on the site, Harbor discovered the contamination. It legally disposed of the waste and sued Burlington for the cleanup costs.

## II

■ Harbor's claim was dismissed upon Burlington's motion for summary judgment. A moving party is entitled to summary judgment when there is no genuine issue as to any material fact, as demonstrated by the pleadings, affidavits, depositions, and admissions on file.[1] Reasonable inferences from the evidence are resolved against the moving party.[2] Such motions should be granted only if a reasonable person could reach but one conclusion from all the ev-

---

[1]CR 56(c); *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998) (citing *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 220, 802 P.2d 1360 (1991)).

[2]*Folsom*, 135 Wn.2d at 663 (citing *Lamon v. McDonnell Douglas Corp.*, 91 Wn.2d 345, 349, 588 P.2d 1346 (1979)).

idence.[3] Appellate courts reviewing summary judgments engage in the same inquiry as the trial court (i.e., de novo).[4]

Retroactive application of the 1995 amendments to the MTCA

Before its amendment in 1995, the relevant part of the 1994 statute stated:

**RCW 70.105D.040 Standard of liability—Settlement.** (1) . . . the following persons are liable with respect to a facility:

(a)  The owner or operator of the facility;

(b)  Any person who owned or operated the facility at the time of disposal or release of the hazardous substances;

. . .

(2)  Each person who is liable under this section is strictly liable, jointly and severally, for all remedial action costs and for all natural resource damages resulting from the releases or threatened releases of hazardous substances. . . .

**RCW 70.105D.020 Definitions.**

. . .

(4)  "Facility" means (a) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, vessel, or aircraft, or (b) any site or area where a hazardous substance, other than a consumer product in consumer use, has been deposited, stored, disposed of, or placed, or otherwise come to be located.

. . .

(7)  "Owner or operator" means:

(a)  Any person with any ownership interest in the facility

---

[3]*Folsom*, 135 Wn.2d at 663 (citing *Lamon*, 91 Wn.2d at 350).

[4]*Folsom*, 135 Wn.2d at 663 (citing *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994)).

or who exercises any control over the facility . . .

The term does not include:

. . .

(ii) A person who, without participating in the management of a facility, holds indicia of ownership primarily to protect the person's security interest in the facility.

The 1995 amendments were adopted after the instant case was filed and added the following subsections to RCW 70.105D.020:

(9) "Indicia of ownership" means evidence of a security interest, evidence of an interest in a security interest, or evidence of an interest in a facility securing a loan or other obligation, including any legal or equitable title to a facility acquired incident to foreclosure and its equivalents. Evidence of such interests includes, mortgages, deeds of trust, sellers [sic] interest in a real estate contract, liens, surety bonds, and guarantees of obligations, title held pursuant to a lease financing transaction in which the lessor does not select initially the leased facility, or legal or equitable title obtained pursuant to foreclosure and their equivalents. Evidence of such interests also includes assignments, pledges, or other rights to or other forms of encumbrance against the facility that are held primarily to protect a security interest.

. . .

(12) "Participation in management" means exercising decision-making control over the borrower's operation of the facility, environmental compliance, or assuming or manifesting responsibility for the overall management of the enterprise encompassing the day-to-day decision making of the enterprise.

The term does not include . . . the mere capacity or ability to influence, or the unexercised right to control facility operations;

. . .

(17) "Primarily to protect a security interest" means the indicia of ownership is held primarily for the purpose of securing payment or performance of an obligation. The term does

not include indicia of ownership held primarily for investment purposes nor indicia of ownership held primarily for purposes other than as protection for a security interest. A holder may have other, secondary reasons, for maintaining indicia of ownership, but the primary reason must be for protection of a security interest. . . .

. . .

(21) "Security interest" means an interest in a facility created or established for the purpose of securing a loan or other obligation. Security interests include deeds of trusts, sellers [sic] interest in a real estate contract, liens, legal, or equitable title to a facility acquired incident to foreclosure and its equivalents, and title pursuant to lease financing transactions. . . .

Burlington contends that the definitions in the four subsections which were added in 1995 should be applied retroactively to secured creditors and that they strengthen Burlington's case for upholding summary judgment. We agree.

█ █ In the absence of contrary legislative intent, statutes are presumed to operate prospectively.[5] The presumption may be overcome where an amendment is clearly curative and does not contravene judicial construction of a statute.[6] There are no Washington cases interpreting the MTCA's secured creditor provisions, and thus we focus our inquiry on whether the amendments were clearly curative. Amendments are curative only if they technically correct or clarify an ambiguous statute.[7]

In analyzing the 1995 amendments, we look to their legislative history in order to determine the Legislature's

[5]*Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 30, 864 P.2d 921 (1993).

[6]*In re F.D. Processing, Inc.*, 119 Wn.2d 452, 461-62, 832 P.2d 1303 (1992) (citing *Howell v. Spokane & Inland Empire Blood Bank*, 114 Wn.2d 42, 47, 785 P.2d 815 (1990)).

[7]*Id.* at 461.

intent.[8] Here, the act is titled "[a]n act relating to clarifying the liability of lenders under the model toxics control act." The final bill report states that "[t]he Washington Model Toxics Control Act is modified to clarify the liability of lenders." In addition, the Legislature defined several terms for the first time, which serves as further evidence of the amendments' curative nature. This court has retroactively applied statutory amendments as clearly curative where statutory ambiguities are clarified.[9] Both the legislative history and the nature of the amendments lead us to hold that the 1995 amendments are retroactively applicable.

Application of the MTCA "secured creditor" exemptions

A. Participation in management of a facility

In 1990 the Ninth Circuit stated that "there must be some actual management of the facility" before a secured creditor can be held liable under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA).[10] This test should be equally applicable under the 1994 version of the MTCA.

■ ■ Here, the only evidence of Burlington's ability to influence Hibbard's operations took place before Hibbard started construction. Due to uncertainty about city council plans to construct overhead bridges that might interfere

[8]*Id.* at 460-61 (citing *Howell*, 114 Wn.2d at 47, for the proposition that courts look to a statute's language and purpose to determine retroactivity).

[9]*See Tallerday v. Delong*, 68 Wn. App. 351, 842 P.2d 1023 (1993) (amendment retroactive as to Department of Labor and Industries reimbursement rights where legislation clarified an ambiguity and legislative history stated that the amendment "clarifies" recovery rights); *see also State ex rel. Faulk v. CSG Job Ctr.*, 117 Wn.2d 493, 501, 816 P.2d 725 (1991) (amendment to employment agency act clarified possibly ambiguous statutory definition and applied retroactively where substance of previous law was unchanged and effect on interpretation was negligible).

[10]*In re Bergsoe Metal Corp.*, 910 F.2d 668, 672 (9th Cir. 1990) (noting that secured creditors would never be protected if they are held liable for "management" due to their input in the planning stages of large-scale projects and the encouragement of projects they feel will be successful).

with the building, Hibbard requested a 90-day extension of time on his contractual obligation to commence construction by July 15, 1910. But the ability to influence operations by granting (or denying) an extension of time to comply with contractual obligations during planning stages is not equivalent to actual management of the facility.

Although contractual obligations did force Hibbard to construct a building, there is no evidence Burlington had any control over the construction process or was in any way involved in Hibbard's decision to fill the site with contaminated dirt. Moreover, there is no evidence that Burlington had any control over Hibbard's operations or choice of tenants in the facility. Applying the 1995 MTCA amendments strengthens Burlington's case. There is no evidence Northern Pacific had any "decision-making control" over Hibbard's "operation of the facility."[11] However, with or without the 1995 amendments, there are no genuine issues of material fact which would establish that Burlington participated in the management of the Hibbard property for purposes of the MTCA.

B.    Indicia of ownership primarily to protect a security interest

■ Burlington held legal title to the property until January 14, 1930. The 1993 case of *Waterville Industries v. Finance Authority*,[12] addressed the issue of whether an owner who holds legal title to property as security for a debt is exempt from CERCLA liability. In *Waterville* a quasi-public corporation was the legal titleholder under a sale-and-leaseback agreement and obtained full ownership of the property when the lessee lost its lease rights.[13] The legal titleholder promptly acted to divest itself of the property and the court held that it was protected by CERCLA's

---

[11]1995 addition of RCW 70.105D.020(12) currently at RCW 70.105D.020(13).

[12]*Waterville Indus., Inc. v. Finance Auth.*, 984 F.2d 549 (1st Cir. 1993).

[13]*Id.* at 549.

secured creditor exemptions.[14] As we read the CERCLA secured creditor exemptions, they apply to legal titleholders under real estate contracts as well as legal titleholders under sale-and-leaseback agreements.[15] A legal titleholder under the 1994 version of the MTCA is likewise protected by those secured creditor exemptions.

Harbor argues that we must apply the laws of 1910 to the Hibbard transaction, and that they define a different relationship between a contract seller and purchaser.[16] While the technical nature of a contract seller's interest over the last 90 years has indeed metamorphosed in some significant ways, the question presented is an owner's *reason* for holding legal title (i.e. whether to protect a security interest).

Harbor suggests several reasons why Northern Pacific did not retain legal title primarily to protect a security interest. First, Harbor asserts that the building was an investment that "belonged" to Northern Pacific. While construction of the building buttressed Northern Pacific's security interest, the building was not its investment. Northern Pacific's ownership of the land and building is irrelevant here.

Second, Harbor notes that Northern Pacific's ability to assign or transfer its interest in the contract was not restricted and that Northern Pacific pledged its interest as security in other transactions. Harbor overlooks the fact that banks today often follow these same practices—mod-

---

[14]*Id*. at 553-54 (stating "the exception serves its basic policy: to protect bona fide lenders and to avoid imposing liability on 'owners' who are not in fact seeking to profit from the investment opportunity normally presented by prolonged ownership.").

[15]*See Snediker Developers Ltd. Partnership v. Evans*, 773 F. Supp. 984 (E.D. Mich. 1991) (land contract vendor held title to property as security to ensure purchaser would meet obligations) (citing *Bergsoe*, 910 F.2d at 671).

[16]*See Ashford v. Reese*, 132 Wash. 649, 233 P. 29 (1925) (purchaser rescinded contract of sale and was reimbursed payments due to failure of consideration when fire destroyed building); *but c.f. Roy v. Vaughan*, 100 Wash. 345, 347, 170 P. 1019 (1918) ("the vendor retains legal title as security for payment of the purchase price, covenanting that when so paid, he will convey the land to the vendee"); *Washington Iron Works Co. v. King County*, 20 Wash. 150, 153, 54 P. 1004 (1898) (government held legal title to secure unpaid purchase price).

–

ern mortgages are often pledged and resold on secondary financial markets or conglomerated into publicly traded mutual funds. These practices allow for more efficient allocation of capital and economic growth but do not change the primary purpose for holding a security interest: protection of a secured creditor. It is irrelevant that Northern Pacific was able to assign or transfer its contractual rights.

Finally, Harbor contends that Northern Pacific sought to profit from the Hibbard deal by receiving 80 percent of the building's rail freight during the term that the contract was to run. However, Hibbard and his tenants were not obligated to ship anything from the building, or for that matter, to ship via Northern Pacific unless Northern Pacific offered competitive shipping terms. Northern Pacific did not stand to profit any more or any less than other railroads for transporting freight to or from the property. The undertaking to offer a portion of the building's freight to Northern Pacific does not undermine the primary purpose of protecting a security interest.

Hibbard had full possession of the property and the rights incident thereto. Hibbard had the right to pay off the contract's balance and receive the deed, but Northern Pacific had no right to possession unless Hibbard defaulted. We hold that Northern Pacific was primarily protecting its security interest under the 1994 version of the MTCA.

The 1995 amendments to the MTCA fortify Burlington's exemption. The 1995 addition of RCW 70.105D.020(9) defines "indicia of ownership" in part as "a sellers [sic] interest in a real estate contract." Northern Pacific retained such indicia of ownership in the real estate contract with Hibbard. We thus hold that Northern Pacific was primarily protecting its security interest under the 1995 version of the MTCA.[17]

Because there are no genuine issues of material fact as

---

[17]Even if Northern Pacific had retained title to ensure that Hibbard complied with his obligation to ship at least 80 percent of any rail freight via Northern Pacific, the 1995 addition of RCW 70.105D.020(17) states "[one] may have other, secondary reasons, for maintaining indicia of ownership, but the primary reason must be for the protection of a security interest." Similarly, the 1994 MTCA looks

to whether Northern Pacific retained title to the property in 1910 except "primarily for the purpose of protecting a security interest," we affirm the summary judgment.

Attorneys' fees and costs on appeal

■ RCW 70.105D.080 states that the prevailing party in litigation under the MTCA "shall recover its reasonable attorneys' fees and costs."[18] Because Burlington has prevailed on appeal, we grant Burlington's request for attorney fees, subject to compliance with RAP 18.1.

Affirmed.

KENNEDY, C.J., and WEBSTER, J., concur.

Review denied at 138 Wn.2d 1005 (1999).

to the primary reason for maintaining indicia of ownership and does not prohibit secondary reasons.

[18]*See Louisiana-Pacific Corp. v. Asarco, Inc.*, 131 Wn.2d 587, 604, 934 P.2d 685 (1997) (prevailing party is entitled to attorneys' fees, costs, and other reasonably necessary expenses of litigation based upon equitable factors the court determines are appropriate).