**In re Mark Joseph DuFRAYNE, Rosemary DuFrayne, Debtors.**

**Mark Joseph DuFRAYNE, Rosemary DuFrayne, Plaintiffs,**

**v.**

**FTB MORTGAGE SERVICES, INC., Defendant.**

**Bankruptcy No. 94–14932SR. Adv. No. 95–831.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 4, 1996.

Robert P. Frank, Tobey M. Daluz, Reed Smith Shaw & McClay, Philadelphia, PA, for debtors.

Peter C. Cilio, Federman & Phelan, Philadelphia, PA.

Michael L. Krancer, David M.M. Taffet, Blank Rome Comisky & McCauley, Philadelphia, PA.

Frederic J. Baker, Senior Assistant United States Trustee, Office of the U.S. Trustee, Philadelphia, PA.

**1.** Fed.R.Civ.P. 12(b)(6) is made applicable here pursuant to Rule 7012 of the Federal Rules of

*OPINION*

STEPHEN RASLAVICH, Bankruptcy Judge.

## INTRODUCTION

Presently before the Court is the motion of secured creditor FTB Mortgage Services, Inc. ("FTB") to dismiss Counts I, II and III of the Complaint filed by joint debtors Mark and Rosemary DuFrayne ("Debtors"). FTB moves to dismiss these counts pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.")[1] on the basis that they fail to state claims for which relief can be granted.

A hearing on the motion was held on February 1, 1996, after the conclusion of which the Court took the matter under advisement. For the reasons stated herein, the Court grants FTB's motion and dismisses Counts I, II, and III.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over the parties and subject matter of this core proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a), 157(b)(1), (b)(2)(A) and (O).

## BACKGROUND

The instant case witnesses the latest round of fighting between the Debtor/homeowners and their mortgage lender, FTB, in a battle to determine which party shall bear the brunt of the economic consequences that are likely to result from a decision of the Environmental Protection Agency ("EPA") to include the Debtors' residence, FTB collateral, as part of a Superfund clean-up site. The primary issue of dispute under Counts I and II concerns whether FTB, by obtaining a security interest in the residence under a mortgage at a time when it knew, or should have known about the contamination and the EPA's plans for remediation of the property, may be held liable to the Debtors for any response costs that they incur, or become liable for, under the Comprehensive Environmental Resource Compensation and Liability Act ("CERCLA"), codified in part as amended at 42 U.S.C. §§ 9601–9675 (1995), or whether FTB is exempt from such liability

Bankruptcy Procedure ("Fed.R.Bankr.P.").

under the so called "secured lender exception" of CERCLA. *See* 42 U.S.C. § 9601(20)(A). The dispute over Count III centers on whether the Debtors may collaterally attack in this Court an adverse state court judgment that was obtained prior to the filing of their bankruptcy petition.

The facts which are central both to the Debtors' bankruptcy case in general, and this adversary proceeding in particular, were previously examined by the Court and discussed in its Memorandum Opinion dated September 20, 1995 ("Prior Opinion"), denying confirmation of the Debtors' proposed plan of reorganization. The factual findings made in the Prior Opinion are the law of the case and are therefore binding on the parties in this proceeding. *See e.g., Safir v. Dole,* 718 F.2d 475, 480–81 (D.C.Cir.1983), cert. denied, 467 U.S. 1206, 104 S.Ct. 2389, 81 L.Ed.2d 347 (1984); *In re PCH Associates,* 122 B.R. 7, 9 (S.D.N.Y.1990), *vacated on different grounds,* 949 F.2d 585 (2d Cir.1991). A summary of the relevant facts from the Prior Opinion, and the factual allegations of the Complaint, follow.

The Debtors' residence is located at 6 East Plumstead Avenue, Lansdowne, Pennsylvania (the "Property"). The Debtors purchased the Property in 1989 for the sum of $140,000.00, financing $108,000.00 of the purchase price through the E.B. Mortgage Corporation ("E.B. Mortgage Corp."). The loan was evidenced by a promissory note dated May 31, 1989 ("Note"), and was secured by a first mortgage on the Property ("Mortgage") of even date with the Note. The E.B. Mortgage Corp. was apparently succeeded in interest by Maryland National Mortgage Corporation ("MNMC"), whose interests were then later succeeded to by FTB.

The events which led to the filing of the Debtors' Chapter 11 case, and ultimately to the filing of this adversary proceeding, had their genesis in November 1991. It was during the week of Thanksgiving of that year that the Husband/Debtor first learned that a neighbor's house had been identified by the EPA as being contaminated by radioactive "tailings" from an ore milling process that had been conducted at a factory in the area during the period from about 1915 to 1925.

Apparently, large quantities of the tailings, essentially pulverized rock resembling sand from which radium ore had been extracted, were hauled away from the factory by local building contractors of the era and used in the construction of new homes nearby. Upon learning about the contamination at their neighbor's house, the Debtors began to suspect that their home might also be contaminated since it had been built during the same summer and has the same floor plan as the neighbor's house.

The Debtors' suspicions concerning contamination of the Property were confirmed when, using a borrowed geiger counter, they detected the presence of radiation in the basement. Subsequent testing by the EPA revealed contamination by radium 226 and thorium 230. By February 1992, the EPA had identified a total of 29 residences in the area, including the Property, as locations "where radioactive wastes have been deposited". 57 Fed.Reg. 4824, 4828 (Feb. 7, 1992). The number of affected homes, however, was later increased to 40. The area became formally known as the Austin Avenue Radiation Superfund Site ("Austin Avenue Site"), so named due to the location of the factory from which the contamination originated, the W.L. Cummings Radium Processing Co., at the intersection of Austin and Union Avenues in Lansdowne. *Id.*

Initially, the Debtors continued to reside at the Property while the EPA investigated the Austin Avenue Site and began developing a clean-up strategy. On or about December 21, 1991, the EPA installed a device at the Property that continuously pumps contaminated air from the basement and presumably exchanges it with outside air ("Air Exchanger"). Complaint at ¶ 34. In or about June 1992, however, the EPA temporarily relocated the Debtors to other quarters after it was discovered that the Wife/Debtor was pregnant with the couple's second child. The Debtors were allowed to return to the Property in or around October 1992, and have continued to reside there ever since. The Debtors continued occupancy of the Property is subject to a set of strict guidelines that were established for them by the EPA to reduce the health risks posed by exposure to

the radioactive contamination present in their home.[2]

The initial findings and recommendations of the EPA for remediation of the Austin Avenue Site were presented in a document entitled "Proposed Remedial Action Plan". The Debtors belong to an organized group of affected homeowners who, with the assistance of legal counsel, publicly commented on, and opposed, the Proposed Remedial Action Plan. Complaint at ¶ 31. In response to public comment received on the initial plan, the EPA issued a follow up document entitled "Revised Proposed Remedial Action Plan". Complaint at ¶ 26–27. Finally, after responding to public comment received on the revised plan, the EPA issued a formal Record of Decision pertaining to the Austin Avenue Site in which it detailed its findings concerning the nature and extent of the contamination and its plans for the clean-up of the site and remediation of the homes located there.

Under the Record of Decision certain of the affected homeowners, the Debtors included, were given the option of choosing temporary relocation from their homes, removal and disposal of contamination from each building site, and either: A) onsite relocation in a newly built replacement structure; B) permanent offsite relocation in suitable alternative housing; or C) onsite relocation in the original building, if repairs to that structure were practicable. The Debtors chose option "A". At the hearing on confirmation, the Husband/Debtor testified that he was informed by the EPA that even after remediation is completed, and their home rebuilt, the EPA will not certify the Property to be free of contamination. Complaint at ¶ 43. He also testified that the EPA informed him that the rebuilt Property will not be removed from the Superfund list, Complaint at ¶ 42, due to the subsequent discovery of extensive ground water contamination in the area directly related to the radium processing that took place at the old Cummings factory.

The Debtors' problems with their mortgage lender were apparently precipitated by the fact that, beginning in or around the spring of 1992, they ceased making the monthly payments due under the Note and Mortgage. Rather than seeking to remedy the default by foreclosure of the Mortgage, MNMC (the Note and Mortgage holder at the time) instead chose to commence legal proceedings against the Debtors to collect the amount due under the Note. The action on the Note was commenced on or about February 17, 1993, in the Court of Common Pleas of Delaware County ("Court of Common Pleas"). Thereafter, on May 5, 1994, the Court of Common Pleas granted summary judgment in favor of MNMC and entered judgment on the Note in the amount of $126,223.37, plus interest and costs ("Judgement"). The Debtors did not appeal the Judgment.

Not long after entry of the Judgment, on July 29, 1994, the Debtors commenced the underlying bankruptcy case by filing a joint petition for relief under Chapter 11 of the United States Bankruptcy Code. 11 U.S.C. §§ 101–1330 ("Code"). The Debtors allege that it was not until sometime after the commencement of their bankruptcy case that FTB acquired MNMC's interests under the Mortgage and the Judgement. Complaint at ¶ 87.

The Debtors proposed plan of reorganization, which had been filed on January 25, 1995, was denied confirmation by Order dated September 20, 1995. Confirmation was denied, in part, on the basis that the Debtors had failed to provide adequate notice, for due process purposes, to inform FTB that in conjunction with the hearing on confirmation the Court would also be considering an objec-

---

**2.** At the hearing on confirmation of the Debtors' proposed plan of reorganization the Husband/Debtor testified that in late 1991 the EPA had provided the family with guidelines for remaining in the house until repair work could begin, then apparently thought to be approximately one year away. Husband/Debtor stated that he was told that "in all likelihood that the house was safe, as long as we spend a great deal of time on the second and third floor [sic] of the house. And that my wife and my children ... never go into the basement. And that if I needed anything there, I was to run down, get it and come right back up. But for the time being, I was safe in that particular property as long as I followed these very strict guidelines." Prior Opinion, at 6, n. 5.

tion to its allowed secured claim and/or a request to avoid, in whole or in part, the lien securing same, or in the alternative, that the Court might also conduct a hearing to determine the value of FTB's allowed unsecured and secured claims pursuant to Code § 506(a). Prior Opinion, at 16–17. The Order denying confirmation was without prejudice, and specifically contemplated the subsequent filing by the Debtors of appropriate actions to object to FTB's allowed secured claim, avoid FTB's lien, and/or to determine the value of FTB's claims pursuant to Code § 506(a). Alternatively, the Order also contemplated the filing of an amended plan that would incorporate any or all of the foregoing proceedings into its terms, provided that creditors were properly notified that any hearings necessitated by such proceedings would be held in conjunction with the hearing on confirmation of the amended plan. Prior Opinion, at 17–18. Apparently choosing the former course of action, the Debtors commenced the within adversary proceeding by filing the Complaint on October 20, 1995.[3]

In Count I of the Complaint the Debtors seek to establish, *inter alia*, that FTB is liable to them directly under CERCLA for the costs they have already incurred in response to the hazardous waste materials present at the Property. In particular, the Debtors seek judgment against FTB in the amount of $3,162.00 under 42 U.S.C. § 9607(a) as reimbursement for the costs which they have allegedly incurred as a result of operating the Air Exchanger.[4] The Debtors also seek a declaratory judgment, pursuant to 42 U.S.C. § 9613(g)(2), and 28

U.S.C. §§ 2201 and 2202, declaring FTB to be jointly and severally liable to the Debtors for any past response costs incurred by the Debtors and for all future response costs relating to the clean-up of the Superfund Site as a whole. In their prayer for relief, the Debtors also request both pre- and post-judgment interest, as well as attorneys' fees, costs and expenses incurred in prosecuting this action.

Count II is generally directed at determining the Debtors' rights of contribution, if any, from FTB. In Count II, the Debtors seek judgment against FTB, severally, awarding them full reimbursement for all response costs they have already incurred, or will incur in connection with the Superfund Site. Next, the Debtors request a declaratory judgement allocating, as between them, full liability for any response costs to FTB under 42 U.S.C. § 9613(f)(1) and 28 U.S.C. §§ 2201 and 2202, and holding FTB liable to the Debtors for any and all response costs incurred at the Superfund Site itself. The Debtors also seek an award of attorneys' fees and expenses.

In Count III, the Debtors allege that the Judgment itself is the product of the fraudulent conduct of MNMC, i.e., bad faith and the misrepresentation of material facts, in the Court of Common Pleas. To redress this alleged wrong, the Debtors seek equitable relief in the form of a judgment against FTB, as successor to MNMC, awarding the Debtors an amount equal to all of the pre-petition interest paid on the Note and all of the legal fees and costs that they incurred in attempt-

---

**3.** Counts I through III are discussed *infra*. Count IV is the Debtor's objection to FTB's proof of claim under Code § 502(b). In Count I the Debtors seek an overall reduction in the amount of FTB's claim to zero on the basis of FTB's alleged liability to the Debtors under the CERCLA claims asserted in Counts I and II, and the equitable claim asserted in Count III. The Debtors also assert that FTB lacks standing to file a proof of claim on the basis that FTB failed to comply with the notice requirements of Fed. R.Bankr.P. 3001(e)(2). In Count V the Debtors seek a determination under Code § 506(a) that to the extent FTB is found to hold an allowed claim in any amount, that such claim is wholly unsecured because the collateral no longer has any value due to the hazardous waste contamination present there, and/or because the collateral has a

negative value due to the multi-million dollar CERCLA liability associated with the clean-up. In Count VI the Debtors seek the avoidance of FTB's mortgage lien under Code § 544(b) to the extent that FTB's claim is determined to be unsecured. Finally, in Count VII the Debtors seek the avoidance of the Judgment itself as a preference under Code § 547(b).

**4.** The damages requested allegedly pertain to the costs of both the electricity needed to run the Air Exchanger, and the additional heat required in the residence due to the operation of the device. The Debtors posit that such costs are response costs, Complaint ¶¶ 66–67, recoverable from FTB under 42 U.S.C. § 9607(a).

ing to counter MNMC's allegedly fraudulent acts.

FTB moves to dismiss Counts I, II, and III pursuant to Fed.R.Civ.P. 12(b)(6), alleging that these counts fail to state claims for which relief can be granted. With respect to Counts I and II, FTB argues that because it is a mortgage lender, not an "owner or operator", it is exempt from liability for response costs incurred in connection with the Property under the secured lender exemption of CERCLA, 42 U.S.C. § 9601(20)(A), and therefore can not be held liable to the Debtors for any of the costs sought to be imposed. As to Count III, FTB posits that the Debtors can not be granted the relief sought since the Judgment, a final order of a state court of competent jurisdiction, is fully enforceable and unassailable in this Court under the full faith and credit doctrine. 28 U.S.C. § 1738. Alternatively, FTB argues that the doctrines of res judicata and collateral estoppel preclude the Debtors' challenge to the Judgment and therefore operate as an absolute bar to the relief requested in Count III. FTB also argues that because MNMC's representations to the Court of Common Pleas as to the nature and extent of the contamination of the Property were consistent with published EPA reports on the topic, they cannot give rise to a claim based on misrepresentation or bad faith. Finally, FTB argues that there is no basis in applicable law or statute which supports the Debtors' claim for reimbursement of legal expenses that were essentially incurred in defense of MNMC's action on the Note.

### DISCUSSION

#### A. Rule 12(b)(6) Motion to Dismiss:

■ It is well established law that motions to dismiss are generally viewed with disfavor and are to be granted only in the unusual case in which the plaintiff alleges facts that show on the face of the complaint that there is some insuperable bar to the relief requested. *See e.g., Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir.1995); 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 1357, at 299 (2d ed. 1990).

■ When presented with a motion to dismiss, the issue before the court is not whether the plaintiff ultimately will prevail, but whether the plaintiff is entitled to offer evidence in support of its claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Indeed, though it may appear on the face of the pleadings that a recovery is remote or unlikely, that, however, is not the test. *Id.* Rather, in considering the motion the court must accept all factual allegations in the complaint and all reasonable inferences that can be drawn therefrom as true, and view them in the light most favorable to the non-moving party. *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3rd Cir.1989); *Angelastro v. Prudential–Bache Securities, Inc.*, 764 F.2d 939, 944 (3rd Cir.), *cert. denied*, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985). The presumption of truthfulness, however, is not accorded to legal conclusions, deductions or opinions which are couched as factual allegations. *Moore's Federal Practice*, ¶ 12.07[2.–5], at 12–84 to 12–85 (2d ed. 1993). A motion to dismiss may only be granted if it appears beyond reasonable doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *See City of Philadelphia v. Lead Industries Ass'n, Inc.*, 994 F.2d 112, 118 (3rd Cir.1993) (citing *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The burden of establishing that no claim has been stated is on the movant. *Johnsrud v. Carter*, 620 F.2d 29, 33 (3rd Cir.1980); *Moore's Federal Practice*, ¶ 12.07[2.–5], at 12–84.

#### B. CERCLA:

■ CERCLA was enacted by Congress in 1980 in response to the environmental and public health hazards posed by the improper disposal of hazardous waste materials. *United States v. Maryland Bank & Trust Co.*, 632 F.Supp. 573, 576 (D.Md.1986); H.Rep. No. 1016, Part I, 96th Cong., 2d Sess. I, 17–22 (1980), *reprinted in*, 1980 U.S.Code Cong. & Admin.News 6119, 6119–25. The essential policy underlying CERCLA is to place the ultimate responsibility for cleaning up hazardous wastes " 'on those responsible for [the] problems caused by the disposal of chemical poison.' " *United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1553 (11th

Cir.1990) (quoting *Florida Power and Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (11th Cir.1990)), *cert. denied*, 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772; *United States v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373, 1377 (8th Cir.1989); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir. 1986). Accordingly, CERCLA authorizes the federal government to take appropriate action to clean-up hazardous waste dump sites and to recover the costs associated with such efforts from the parties responsible for creating the danger.[5] *Id.*

■ The EPA is the agency of the federal government that has been delegated primary responsibility for the task of cleaning up and otherwise responding to hazardous waste dump sites. *Maryland Bank & Trust Co.*, 632 F.Supp. at 576; 40 C.F.R. § 1.3 (1995). Actions taken by the EPA in response to actual or threatened releases of hazardous substances are financed primarily from the Hazardous Substance Superfund, the so called "Superfund", established pursuant to the Superfund Amendments and Reauthorization Act of 1986. Pub.L. No. 99–499, 100 Stat. 1613 (1986) (codified in part as amended at 26 U.S.C. § 9507). The costs incurred in responding to or cleaning up a hazardous waste disposal site, i.e., "response costs", are recoverable under § 107(a) of CERCLA. 42 U.S.C. § 9607(a).

■ CERCLA subjects four categories of "responsible parties" to potential liability for response costs. These are: 1) the current owner or operator of a hazardous substance facility; 2) any person who owned or operated such facility at the time of disposal of hazardous substances there; 3) any person who arranged for treatment or disposal of hazardous substances at the facility; and 4) any person who accepts or accepted hazardous substances for transport to a treatment or disposal facility selected by them from which a release occurs. *See e.g., Fleet Factors Corp.*, 901 F.2d at 1553; 42 U.S.C.

§ 9607(a). These responsible parties may be held liable for three types of costs that are incurred as a result of a release or threatened release of a hazardous substance: 1) governmental response costs; 2) private response costs incurred by "any other person" consistent with the national contingency plan; and 3) damages for injury caused to natural resources. *Stepan Chemical Co.*, 544 F.Supp. at 1140–41; 42 U.S.C. § 9607(a)(4)(A)–(C).

■ In order to establish liability for response costs under § 107(a) of CERCLA, 42 U.S.C. § 9607(a), the following elements must be satisfied:

1) The site at which costs have been incurred is a "facility", 42 U.S.C. § 9601(9);

2) A "release", or threatened release of a "hazardous substance" from the site has occurred, 42 U.S.C. §§ 9601(14) and (22);

3) The release or threatened release has caused response costs to be incurred; 42 U.S.C. § 9601(25); and

4) The defendant is a person that may be held liable for response costs as a responsible party under one of the four categories delineated in 42 U.S.C. § 9607(a).

*Id.*

C. *Counts I and II:*

It is primarily with respect to the fourth element required for establishing CERCLA liability, i.e., that the defendant is a person that may be held liable under CERCLA, that FTB contends that the claims stated in Counts I and II must fail. In this regard, there does not seem to be any dispute that the only category delineated in 42 U.S.C. § 9607(a), i.e., parties responsible for response costs, that FTB could conceivably be included under is the first one, that is, as a current "owner or operator" of a facility. *See also* Complaint at ¶ 93 (alleging that FTB is liable to the Debtors for response costs as an "owner under Section 107 of CERCLA, 42 U.S.C. § 9607 . . . ."). FTB argues, however, that as a secured lender it is

---

5. Similarly, state governments and private parties that take action to clean-up hazardous wastes may also recover the costs of their efforts from those responsible for creating the hazard. *See Versatile Metals, Inc. v. the Union Corp.*, 693

F.Supp. 1563, 1570–71 (E.D.Pa.1988); *City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135 (E.D.Pa.1982); 42 U.S.C. § 9607(a)(4)(A) and (B).

excluded from the definition of the term "owner or operator" and is therefore statutorily exempt from the liability that the Debtors seek to impose. This argument cuts to the very heart of the Debtors' theory of liability under Counts I and II, since a recovery under either of these counts necessarily turns on FTB's status as an "owner or operator" of the Property. *See generally Waterville Industries, Inc. v. Finance Authority of Maine,* 984 F.2d 549, 554 (1st Cir.1993); *In re Bergsoe Metal Corp,* 910 F.2d 668 (9th Cir.1990).

▮▮▮▮▮ The definition of the term "owner or operator" states, in pertinent part, that "[s]uch term does not include a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility." 42 U.S.C. § 9601(20)(A). The purpose of this provision, more commonly referred to as the "secured lender exemption", *see e.g., In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 119 (2d Cir.1992), or the "security interest exception", *see e.g., Waterville,* 984 F.2d at 551, is to shield from liability those "owners" who are in essence lenders holding title to the property as security for a debt. *Id.* at 552. In the instant case, FTB, as the party claiming the benefit of the exemption, bears the burden of proving its applicability. *Maryland Bank & Trust,* 632 F.Supp. at 578. Both the statute itself and the legislative history are silent as to the types of activities that Congress considered to be impermissible participation in a facility's management, or the sorts of activities that it considered to be consistent with the exemption. *See generally* 57 Fed.Reg. 18345 (April 29, 1992).

The Court observes that the Debtors do not allege in the Complaint that FTB participated in any way in the management of the Property. Thus, the determinative issue here is whether FTB holds indicia of ownership, i.e., the Mortgage, *see generally Guidice v. BFG Electroplating and Mfg. Co., Inc.,* 732 F.Supp. 556, 561 (W.D.Pa.1989) (stating that under Pennsylvania law the holding of a mortgage constitutes an indicia of ownership), primarily to protect its security interest in the Property. In deciding this issue, the Court must examine FTB's motives for holding the Mortgage. *See e.g., In re Bergsoe Metal Corp.,* 910 F.2d at 671.

The crux of the Debtors' argument on this issue is that FTB is primarily motivated not by an intent to protect its security interest in the Property, but rather by an intent to improperly benefit from the EPA sponsored clean-up. The Debtors contend that this case is unique in that the EPA will not only clean-up the Property by demolishing the residence and decontaminating the ground upon which it stood, but, in an apparently unprecedented move, it will also rebuild the residence and restore the Debtors to permanent residence there. The Debtors posit that because FTB acquired its mortgage interest in the Property aware of these facts, it is primarily motivated by an intent to profit from the EPA clean-up and thereby capitalize on the investment opportunity present in long term ownership of that interest. Apparently equating the impending demolition of the residence with destruction of FTB's collateral *in toto,* the Debtors argue that the decision to demolish the residence effectively severed any link that may have existed between repayment of the debt owed by the Debtors and retention of the Mortgage. The Debtors also contend that FTB is attempting to use the exemption as a type of insurance scheme or loan guarantee to insulate its stake in the Property from loss due to the presence of contamination there. In sum, the Debtors argue that FTB is primarily motivated by an intent to profit from the potential gain to be realized upon remediation of the property, and that accordingly, FTB fails to qualify for the exemption and is therefore precluded from benefiting from its protection.

▮▮▮▮ The issues under CERCLA thus framed, the question before the court on the motion to dismiss is whether the Debtors have alleged facts that, when viewed in the light most favorable to the Debtors and presumed to be true, *see e.g., Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384–85 (3d Cir.1994), would support a finding that FTB does not qualify under the secured lender exception, for if FTB does qualify for the exemption, it can not be held

liable to the Debtors for the response costs sought to be imposed under Counts I and II. For the reasons that follow, the Court finds that the facts alleged, considered in the context of a motion to dismiss, together with the authorities cited by the Debtors, lead to the inescapable conclusion that FTB does qualify under the exemption, and that accordingly Counts I and II fail to state claims for which relief can be granted.

Initially, the Court observes that both the Debtors and FTB principally rely on *Maryland Bank & Trust Co.*, 632 F.Supp. 573, as the key decisional authority supporting their opposing legal views on this issue. In that case, secured lender Maryland Bank & Trust Co. ("MB & T") became the record owner of a parcel of real property after foreclosing its mortgage and purchasing the property at the foreclosure sale. The prior owner had operated a trash and garbage business at the site with financing supplied, at least in part, by MB & T. Approximately one year after the foreclosure sale, the prior owner notified the county health department of the existence of certain hazardous wastes that were dumped at the property. These materials included chemical compounds such as toluene and ethylbenzene, and the heavy metals lead, chromium, mercury and zinc. The State of Maryland then contacted the EPA. After conducting tests at the property, the EPA requested and received funding to commence a removal action under CERCLA. Sometime after October 24, 1983, after MB & T had declined the EPA's request that MB & T initiate corrective measures at the site, the EPA proceeded to clean the site itself at a cost of $551,713.50. Thereafter, MB & T refused to tender payment to the government for the cost of the clean-up.

Like the instant case, the general issue in *Maryland Bank & Trust* was whether MB & T could rely on the secured lender exemption to insulate it from liability for the costs of the clean-up. A crucial distinction between *Ma-*

ryland Bank & Trust and the instant case, however, is the fact that MB & T became the record owner of the contaminated property by purchasing it at the foreclosure sale and holding title to it for an extended period of time. During the nearly four years that MB & T retained its full ownership interest in the property, the EPA identified and then remedied the environmental hazard present there. The critical issue before the court in that case was whether MB & T could still claim entitlement to the exemption notwithstanding the fact that it no longer held a security interest in the property. *See* 632 F.Supp. at 574. Holding against MB & T on this issue, the district court stated that:

> [T]he exemption of subsection (20)(A) covers only those persons who, at the time of the clean-up, hold indicia of ownership to protect a then held security interest in the land.... The security interest must exist at the time of the clean-up. The mortgage held by MB & T (the security interest) terminated at the foreclosure sale of May 15, 1992, at which time it ripened into full title."

*Id.* at 579 (citation omitted).[6] *Maryland Bank & Trust*, therefore, is inapposite to the present case since FTB continues to hold only a security interest in the Property, not an interest in fee. Unlike MB & T in that case, until FTB exercises its rights by foreclosing its security and purchasing the Property, it has no actual stake in the value of the Property beyond the amount secured by the Mortgage. Thus, the profits FTB can expect to derive from the transaction involved in this case, remain tied to the loan itself, not the Property.

While it is obvious that the facts in the instant case are not representative of the classic mortgage financing scenario, i.e., where the mortgagee is the same party that initially provided the financing and took a security interest in the collateral, neither are they typified by the circumstances present in

---

**6.** The district court was careful to note in *Maryland Bank & Trust* that since MB & T held the property for an extended period of time, it was not necessary to consider whether the result would have been the same had the secured lender purchased the property at the foreclosure sale and then promptly resold it. 632 F.Supp. at 579

n. 5; *cf. United States v. Mirabile*, Civ. No. 84–2280 (E.D.Pa. Sept. 6, 1985) (available on WESTLAW at 1985 WL 97) (holding, *inter alia,* that a former mortgagee that purchased the property at a foreclosure sale and assigned it four months later was exempt from CERCLA liability.)

the *Maryland Bank & Trust* case as the Debtors suggest. Clearly, some investment motive is present in all mortgage financing transactions. FTB's investment interest, however, like that of the lender in the classic mortgage example, is in the mortgage paper itself, not the property serving as security for the debt. Thus, it is of no great consequence here that FTB acquired its interest in the Mortgage from MNMC after the environmental problems were discovered and the Record of Decision determining the remediation plan had been established since FTB has no greater interest in the Property than the original mortgagee would have had at this same juncture had it not parted with that interest. Mortgages, after all, are routinely bought and sold in a secondary market for such interests. *See generally, Thrifts Ask Congress for Loan Limit Help,* The Mortgage Marketplace, Vol. 5, No. 47 (Dec. 11, 1995) (available on WESTLAW at 7329224); Pellenz, *Banking on Local Appeal,* Greater Lansing Business Monthly (Nov. 1, 1991) (available on WESTLAW at 2992373). No cases have been cited to the Court in which the exemption was lost on the basis that, even in part, the lender claiming the exemption acquired its interest in the mortgage at a discount in the secondary market.

The Debtors also contend that FTB is precluded from claiming the benefit of the secured lender exemption because it attempts to use it as a type of insurance scheme, or loan guarantee. The Debtors posit that the application of the exemption in this case will permit FTB to reap the benefits of the EPA clean-up, i.e., restoration of value to the Property, without participating in any of the costs associated with that clean-up.

Again, the Debtors' reliance on *Maryland Bank & Trust* is misplaced as is apparent from the following language quoted from that opinion:

> The interpretation of section 101(20)(A) urged upon the Court by MB & T runs counter to the policies underlying CERCLA. Under the scenario put forward by the bank, the federal government alone would shoulder the cost of cleaning up the site, while the former mortgagee-turned-owner, would benefit from the clean-up by the increased value of the now unpolluted land. At the foreclosure sale, the mortgagee could acquire the property cheaply. All other prospective purchasers would be faced with potential CERCLA liability, and would shy away from the sale. Yet once the property has been cleared at the taxpayers' expense and becomes marketable, the mortgagee-turned-owner would be in a position to sell the site at a profit.
>
> In essence, the defendant's position would convert CERCLA into an insurance scheme for financial institutions, protecting them against possible losses due to security of loans with polluted properties. Mortgagees, however, already have the means to protect themselves, by making prudent loans.[7]

*Id.* at 580.

Surprisingly, the Debtors rely on this quote in support of their position despite the fact that it is clearly directed at the situation, distinguishable from the instant case, where the foreclosing mortgagee has become the outright owner of the property. Clearly, the quoted language makes little sense otherwise since it is the combination both of the purchase of the foreclosed property for a pittance due to the contamination, and the claim of exemption from liability for the clean-up costs which underlie its reasoning. In such a case, the "mortgagee-turned-owner" no longer has an interest in the property that is based on security for the debt, as required by the statute. 42 U.S.C. § 9601(20)(A).

■ The Debtors' reliance on this theory, and this quote in particular, is even more surprising in light of the footnote which the Debtors neglected to include when they quoted the above text. The footnote states: "The mortgagees also have the options of not foreclosing and not bidding at the foreclosure sale. Both steps would apparently insulate the mortgagee from liability." 632 F.Supp. at 580 n. 6. Since FTB has no obligation to

---

7. This excerpt from the opinion concludes with a footnote which states: "The mortgagees also have the options of not foreclosing and not bidding at the foreclosure sale. Both steps would apparently insulate the mortgagee from liability." 632 F.Supp. at 580 n. 6.

foreclose and take possession of the Property, *In re T.P. Long Chemical, Inc.,* 45 B.R. 278, 288 (Bankr.N.D.Ohio 1985), and indeed, since a foreclosure has admittedly not occurred, FTB does not stand to benefit from the EPA sponsored clean-up of the Property in the manner proscribed by *Maryland Bank & Trust.*[8]

· The Debtors also argue that FTB cannot benefit from the secured lender exemption since the EPA's policy regarding enforcement of CERCLA protects only those lenders "that acquire property involuntarily". Debtors' Memorandum of Law, at 4 and 40 (quoting 60 Fed.Reg. 63517 (Dec. 11, 1995)). This argument further illustrates how the Debtors misinterpret the application of the exemption in this case. Nothing in the exemption itself, or in the interpretive rule initially promulgated by the EPA in April 1992, the so called Lender Liability Rule ("Rule"), supports the position that the Debtors assert. On the contrary, the Rule was originally intended to address some of the uncertainties surrounding application of the exemption to lenders and government entities that had acquired properties having environmental problems through involuntary transfers.

After the Rule was vacated in *Kelley v. EPA,* 15 F.3d 1100 (D.C.Cir.1994) (holding, *inter alia,.* that the EPA lacked authority to issue the Rule as a binding regulation), *cert denied sub nom., American Bankers Ass'n v. Kelley,* —— U.S. ——, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995), the EPA issued the policy statement cited by the Debtors. Like the Rule before it, the purpose of the policy statement, is to:

> ... provide guidance within the EPA and [the Department of Justice ("DOJ") ] on the exercise of enforcement discretion in

determining whether particular lenders and government entities that acquire property involuntarily may be subject to CERCLA enforcement actions. The Memorandum advises EPA and DOJ personnel to consult both the regulatory text of the [Lender Liability] Rule and the accompanying preamble language in exercising their enforcement discretion under CERCLA as to lenders and government entities that acquire property involuntarily.

60 Fed.Reg. at 63518.

■ Contrary to the Debtors' assertions, there is nothing in either the Rule or the follow up policy statement that even remotely suggests that the exemption is only applicable to lenders that acquire property involuntarily. Such an interpretation would render the exemption superfluous since it would only apply after the security interest had been extinguished through foreclosure or some other equivalent state law means. The plain language of the exemption itself, both the Rule and the EPA policy statement interpreting same, and the case law applying the exemption all clearly indicate that the exemption is applicable to lenders while they continue to hold a security interest, and in some circumstances, even after the security interest is extinguished and the lender has become the owner of its former collateral. *See e.g., Waterville Industries,* 984 F.2d 549 *Fleet Factors,* 901 F.2d 1550; *Maryland Bank & Trust,* 632 F.Supp. 573.

In sum, the Court finds that the Debtors have failed to allege facts in Counts I and II of the complaint which can support a finding that FTB, either directly or indirectly as the successor-in-interest to MNMC, is liable for response costs as an "owner or operator" of the Property under CERCLA § 107(a). 42 U.S.C. § 9607(a). Since a necessary element

---

**8.** Ironically, the Debtors themselves have the appearance of trying to use CERCLA as a type of insurance scheme since they are attempting to shift all of their response costs and any potential CERCLA liability to FTB under the liability provisions of CERCLA. *Cf. T.P. Long Chemical, Inc.,* 45 B.R. at 288 (observing, *inter alia,* that the EPA was in essence attempting to make secured lender BankOhio an insurer of the environmental risks caused by the collateral the bank held as security for a debt). Secured lender FTB, notwithstanding the possibility that it ac-

quired its interests under the Judgement and Mortgage at a discount, bears the inherent risk that its collateral will never have sufficient value to cover the amount of the debt owed. The exemption protects FTB from having to bear the additional burden placed on "owners" of having to pay for clean-up costs, *id.* at 288–89, particularly where, as in the instant case, the owner/Debtors will continue to reside at the Property and therefore derive a significant benefit from such clean-up. *Id.* at 289.

for establishing liability under both of these counts is missing, i.e., FTB's status as a responsible party, neither count states a claim for which relief can be granted in favor of the Debtors. Accordingly, Counts I and II must be dismissed pursuant to Fed. R.Civ.P. 12(b)(6).

### D. Count III:

The relief requested in Count III, i.e., an award of damages in an amount equal to all of the pre-petition interest paid on account of the Note, and a portion of the legal expenses incurred by the Debtors in defending against the state court action, is justified, the Debtors contend, on the basis that the Judgment was obtained by fraudulent means. In order to grant such relief, the Court would be required to revisit the facts and circumstances which underlie the Judgement, in essence, to test the validity of the Judgment itself. The debtors contend that this inquiry is permissible here under a generally recognized exception to the doctrines of res judicata and collateral estoppel that applies where the judgment in the prior action is the result of fraudulent conduct such as that alleged.[9]

The Court's analysis of this question necessarily begins with 28 U.S.C. § 1738, commonly known as the "Full Faith and Credit Act". This statute requires a federal court to give a prior state court judgment the same preclusive effect that the judgment would be entitled to in a subsequent proceeding in a court of that state. *See e.g., Migra v. Warren City School District Bd. of Educ.,* 465 U.S. 75, 84–86, 104 S.Ct. 892, 898, 79 L.Ed.2d 56 (1984); *Allen v. McCurry,* 449 U.S. 90, 94–97, 101 S.Ct. 411, 414–16, 66

L.Ed.2d 308 (1980); *Gregory v. Chehi,* 843 F.2d 111, 116 (3rd Cir.1988).

Turning therefore to Pennsylvania law, the Court observes that since the time for filing an appeal of the Judgment expired on or about June 4, 1994, thirty days after its entry, *see e.g., In re Greist,* 431 Pa.Super. 188, 636 A.2d 193, 195 (1994); Pa.R.A.P. 903(a), the Judgment has become a final order, *see e.g., Commonwealth v. Facer,* 669 A.2d 385, 386–87 (Pa.Super.Ct.1995); *Insurance Co. of No. America v. Bishop,* 365 Pa.Super. 183, 529 A.2d 33, 36 (1987); 42 Pa.C.S.A. § 5505, binding on the Debtors even if erroneous. *See In re Estate of Tower,* 463 Pa. 93, 343 A.2d 671, 674–75 (1975); *Miller v. Wayne Title & Trust Co.,* 154 Pa.Super. 329, 35 A.2d 786, 789 (1944); *accord Treinies v. Sunshine Mining Co.,* 308 U.S. 66, 78, 60 S.Ct. 44, 50–51, 84 L.Ed. 85 (1939). As such, the Judgment is not open to collateral attack in any subsequent proceeding in this court, or any other, absent a showing of fraud or a lack of jurisdiction.[10] *See In re Kovalchick,* 175 B.R. 863, 872 (Bankr.E.D.Pa.1994) (citing *Moeller v. Washington County,* 352 Pa. 640, 44 A.2d 252, 254 (1945)); *cf. Pepper v. Litton,* 308 U.S. 295, 305–06, 60 S.Ct. 238, 244–45, 84 L.Ed. 281 (1939) (generally holding that bankruptcy courts are not bound by judgments obtained by fraud); *Garafano v. Amalgamated Insur. Fund (In re Garafano),* 99 B.R. 624, 630–31 (Bankr.E.D.Pa.1989) (same). Consistent with these principles, the relief requested in Count III is founded upon fraudulent conduct which allegedly occurred in the procurement of the Judgment.

It is a well established rule in Pennsylvania, however, that a judgment ob-

---

**9.** Res judicata, now generally refereed to as "claim preclusion", applies when: a) there is a final judgment on the merits; b) involving the same parties or their privies; and c) there is a subsequent lawsuit based on the same cause of action. *Board of Trustees of Trucking Employees Pension Fund v. Centra,* 983 F.2d 495, 504 (3rd Cir.1992). Collateral estoppel, otherwise known as "issue preclusion", applies in a subsequent proceeding when: a) the issue sought to be precluded is the same as that involved in the prior action; b) the issue was actually litigated; c) the issue was decided by a final judgment; and d) the determination was essential to the prior judg-

ment. *Graham v. Internal Revenue Service (In re Graham),* 973 F.2d 1089, 1097 (3rd Cir.1992).

**10.** The state court action resulting in the Judgment admittedly involved a breach of contract action based wholly on the Note. Complaint, at ¶¶ 47–50. It was not alleged in the Complaint that the Court of Common Pleas lacked jurisdiction to hear and finally decide the contract action presented to it, nor that the court was required to decide any issues arising under CERCLA, over which it would have had no jurisdiction, 42 U.S.C. § 9613(b), in order to decide the matter.

tained adversely, will not ordinarily be disturbed after it has become final, *see Insurance Co. of No. America v. Bishop,* 529 A.2d at 36, even on grounds of fraud, except for "extrinsic" fraud, which is promptly complained of after its discovery. *McGary v. Lewis,* 384 Pa. 173, 119 A.2d 497, 501 (1956); *Nixon v. Nixon,* 329 Pa. 256, 198 A. 154, 158 (1938). Extrinsic fraud means some act or conduct of the prevailing party that prevented a fair submission of the controversy to the trier of fact. *McGary v. Lewis,* 119 A.2d at 501; *Willets v. Willets,* 96 Pa.Super. 198, 204 and 206 (1929); *see also In re Gates,* 187 B.R. 426, 432 (Bankr.N.D.N.Y.1995) (Stating that: "it is well settled law [in Pennsylvania] that the fraud for which a judgment can be impeached must be in some matter other than the issue in controversy in the [prior] action."); *Sallada v. Mock,* 277 Pa. 285, 121 A. 54, 55 (1923) (same).

 The conduct complained of in Count III is essentially that MNMC quoted factual material from certain EPA reports out of context, and/or omitted other relevant material information, and actually misstated the factual nature of the contamination present at the Property to the Court of Common Pleas. Complaint at ¶¶ 117–18, 127–136. Even if the Court were to assume the truth of these allegations, as indeed it must in the context of a motion to dismiss, *see e.g., Rocks v. City of Philadelphia,* 868 F.2d at 645, the conduct complained of does not rise to the level of the extrinsic fraud required in order to permit a collateral attack on the Judgement to go forward. In this regard, the Court observes that the Judgment was not entered by default, but rather was the result of a contested motion for summary judgment filed by MNMC. Admittedly, the Debtors participated in the prior action by filing a memorandum of law in opposition to the summary judgement motion. Complaint at ¶ 105. Notably, the Debtors do not allege in Count III the existence of any newly discov-

ered evidence that would justify a result in this Court that is different from that previously obtained in the Court of Common Pleas. On the contrary, although the pleadings in the prior action were not attached to the Complaint as an exhibit, it seems clear that the Debtors rely here on the same information that was available to them in the state court. Thus, to the extent that the Debtors believed that any misrepresentations had been made to the state court, the Debtors had at their disposal in that proceeding the means for setting the record straight. However, the Debtors have not alleged that MNMC acted in a way that prevented them from either: fairly presenting their arguments in opposition to the summary judgment motion; seeking a reconsideration of the Judgment; or from timely filing an appeal. In sum, the allegations in the Complaint can not be read to support a finding of extrinsic fraud. *See e.g., McGary v. Lewis,* 119 A.2d at 500–501 (the record of the prior proceeding disclosed that the evidence sought to be introduced in a subsequent proceeding was available to the petitioner at the time of the original proceeding); *Insurance Co. of No. America v. Bishop,* 529 A.2d at 36 (same); *Nixon v. Nixon,* 198 A. at 159–60 (same). Accordingly, the Judgment is not subject to collateral attack in this Court on the grounds asserted.[11] *See In re Kovalchick,* 175 B.R. at 873.

 What the Debtors really seem to be arguing here is that the Court of Common Pleas' decision on the summary judgment motion was in error. This Court, however, does not sit as a court of appeals for state court judgments. *See e.g., Moore v. City of Costa Mesa,* 678 F.Supp. 1448, 1450 n. 3 (C.D.Cal.1987) (holding, *inter alia,* that the lower federal courts do not sit as courts of appeal for state court judgements) (citing *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); and *Rooker v. Fidelity*

---

11. Moreover, even a petition to open would not provide the Debtors with a means of collaterally attacking the Judgment. A petition to open a judgment is essentially an appeal to the conscience of the court based on equitable considerations such as fraud. *McGary v. Lewis,* 119 A.2d at 501; *Nixon v. Nixon,* 198 A. at 159. A petition to open based on allegations of fraud, however, filed after the judgment becomes final may only be granted on the basis of extrinsic fraud. *McGary,* 119 A.2d at 501. As discussed *supra,* the conduct complained of does not rise to that level.

*Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923)). Thus, even if the Judgment is in error, it is nonetheless a final order that is binding on the Debtors in this proceeding. *In re Kovalchick,* 175 B.R at 871; *In re Estate of Tower,* 343 A.2d at 674–75.

Since the Debtors have failed to allege facts in the Complaint that would justify a collateral attack on the Judgment on the basis of fraud, the Debtors are effectively precluded from arguing that such fraud justifies the relief requested in Count III. It is rudimentary that the allegations of fraud made in Count III comprise a necessary element of the equitable claims asserted. Therefore, it follows that because the Debtors are unable to prove this element of the claims asserted, Count III fails to state a claim for which relief can be granted and must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

### CONCLUSION

Based on the foregoing conclusions, the Court finds that Counts I, II and III of the Complaint fail to state claims for which relief may be granted in favor of the Debtors. Accordingly, FTB's motion to dismiss is granted, and Counts I, II and III are dismissed.